WILSON & TOOMER FERTILIZER COMPANY, A CORPORATION,
*Plaintiff in Error,* v. NORA LEE, *Defendant in Error.*

Bivision B.

Opinion Filed December 4, 1924.

Judgment Reaffirmed December 1, 1925.

1. An employee is not charged by law with the assumption of a
risk arising out of defective appliances provided by his em-
ployer, unless his employment was of such a nature as to
bring to his attention and cause him to realize and compre-
hend the dangers incident to the use of such appliances.

2. The servant has a right to assume that the master has used
due diligence in providing suitable appliances or implements
for the operation of his business, and does not assume the
risk of the employer's negligence in making such provision.

3. A servant who continues without objection in his master's
employ with knowledge of a defective apparatus, assumed the
hazard incident thereto, but unless the evidence clearly shows
the assumption of the risk, it is a matter properly left to the
determination of the jury.

4. The doctrine of assumption of risk to extend only to those
risks and hazards ordinarily and usually incident to the em-
ployment voluntarily engaged in, that is to say risks such as

he knows to exist, or may know to exist by ordinary care. It does not extend to risks created by the negligent act of the master.

5. Assumption of risk is a matter of contract. Contributory negligence is a question of conduct. If a servant would be defeated of a right of recovery for an injury by the rule of assumed risk it would be because he agreed, long before the accident happened, that he would assume the very risk from which his injury arose. If he were to be defeated by the rule of contributory negligence, it would be because his conduct at the time of the accident, and under all the attendant circumstances, fell short of ordinary care.

6. All who serve the same master, work under the same control, derive authority and compensation from the same common source, are engaged in the same general business, though it may be in different grades or departments of it, are fellow servants who take the risk of each others negligence, and the master is not bound to indemnify one servant for injuries caused by the negligence of another servant in the same common employment as himself, unless the negligent servant was the master's representative.

7. A derrick constructed with so narrow margin of safety as the one in this case is an unsafe implement to work with, and the master furnishing it to a servant is charged with knowledge thereof, and the danger attending its use. Failure to communicate such knowledge to the servant renders the master guilty of such negligence as makes him liable to the servant in damages.

A Writ of Error to the Circuit Court for Duval County; Daniel A. Simmons, Judge.

Judgment affirmed.

*Marks, Marks & Holt,* for Plaintiff in Error;

*Kent & Dewell,* for Defendant in Error.

TERRELL, J.—About five o'clock June 6, 1921, W. F. Lee, aged thirty-four, while in the employ of Wilson & Toomer Fertilizer Company erecting a warehouse, was struck by an A Frame Derrick, fell from an elevated scaffold striking head first on the floor twenty-two feet below, and as a result of the fall was instantly killed.

The derrick was rigged on the scaffold from which Lee fell, and was twenty-two feet and six inches tall, seven foot base made of 2x6's with 2x8 base.

Nora Lee, the widow of the deceased F. F. Lee, brought an action claiming damages in the sum of $100,000.00. The second count of the declaration alleges negligence in that the derrick was equipped with only two guy ropes when it should have been equipped with three, while the third count alleges negligence in that the derrick was improperly constructed, having insufficient base projection beyond the uprights making it an unsafe appliance to work with. The first and fourth counts were eliminated.

To these allegations of negligence in addition to the general issue, the defendant, Wilson & Toomer Fertilizer Company, pleaded contributory negligence of the deceased, negligence on the part of fellow servants of the deceased, and assumption of risk.

At the conclusion of plaintiff's testimony motion for an instructed verdict in favor of the defendant was denied. The jury found for the plaintiff in the sum of $15,000.00, a new trial was denied, final judgment was entered on the verdict, and writ of error was taken.

The evidence is without material conflict as to the foregoing facts and the further fact that the deceased had been working for the defendant as a carpenter about three weeks in what was called the rigging gang, which had charge of the hoisting and placing of new timbers necessary to complete the upper frame work of the structure. The derrick in question was used for this purpose and was constructed

about two weeks prior to the accident by two carpenters on the job under direction of the foreman Crews.

The evidence further shows that Lee assisted in moving the derirck from time to time, that it had been moved about twenty-five minutes prior to the accident, that Lee and Burris were the only men on the scaffold at the time of the accident, that when first constructed the derrick was anchored by three guy ropes, but at the time of the accident, and for several days prior thereto it was anchored with only two guy ropes, that the derrick was not secured in any manner except by the two guys, that it fell when lifting the first timber after it had been placed in that position, that there was a side strain on the derrick on account of the location of the snatch block or hoisting line, that on previous occasions the derrick had raised slightly on one foot and that one Matox was the leader of the rigging gang.

The witness Burris who was on the scaffold with Lee at the time described the accident substantially as follows: "The men below pulled on this rope, pulled this timber up to the scaffold, about twelve inches above the scaffold, which they hollered to us to land. * * * I told Mr. Lee to take that end over there and place it, so he took his end and put it down and stooped down, holding it. * * * I was standing with one foot on the scaffold where I was going to land the timber and the other on the scaffold where the 'A' frame was standing, and just as I went to pull my end of the timber out of the way to get it in line, that is, so they could slack the rope and let it down, I felt this derrick move with my left hand, and I hollered to Mr. Lee and all the rest to 'Look out,' and I turned loose the timber and jumped behind the derrick * * * and I ran behind it and the derrick raised up, and as it did, it caught him in the waist line and slung him loose so that he fell."

A drawing of the derrick and scaffold on which it was placed at the time of the accident was filed as evidence and

made part of the record here.  For the purpose of analyzing and showing its behavior we deduce from this drawing the following blue print or horizontal projection marked ''B'':

SKETCH

"A" FRAME DERRICK

CAUSING DEATH OF FRANK LEE JUNE 6, 1921.

Scale ¼"= 1ft.

1"= 2000#

Horizontal Projection of "A" frame, Guy Line and Hoisting Line. Force Polygon shown by dotted line.
#1

Vertical Projection of "A" Frame with Force Polygon from Vertical Load of 1000# and Resulting Horizontal Thrust of 150#
#2

Vertical Projection of "A" Frame with Force Polygon giving a Horizontal Thrust in Excess of the Stability of the "A" Frame.
#3

As shown by the testimony the derrick was resting on a scaffold twenty-two feet above the first floor of the building being constructed.  It consisted of an ''A'' frame twenty-

two feet, six inches high coming to a point at the top and having a base of seven feet. The "A" frame was supported by one guy line passing from its top in a plane at right angles to the base and in a direction backward or toward the slope of the "A" frame. (The guy line in front of the "A" frame in the direction away from its slope had no influence on its failure or overturning and is omitted.) From the top of the "A" frame was rigged a two-part line, one end of which was fastened at its apex and the other end passed downward through a pulley attached to the weight, thence upward through a pulley at the top of the "A" frame, thence to a pulley or snatch block attached to a support below partly in front of and partly to one side of the "A" frame. This pulley fixed the direction of the "pull" upon the "A" frame and provided a change in direction for affording a favorable purchase for the five men working at the power end of the line.

By application of well-known natural or mechanical laws figure 1 of "B" shows that (neglecting a negligible increment "1" for overcoming inertia and ignoring friction) the result of a pull of 375 pounds on the hoisting line to raise a weight of 750 pounds by a two-part line produced a horizontal thrust of 150 pounds at the top of the "A" frame tending to overturn same in a direction parallel with its base.

Figure 2 of "B" shows the direction of the "resultant" of the weight of the suspended timber 750 pounds estimated plus the weight of the "A" frame 250 pounds estimated. In hoisting the timber the resultant force therefrom passed through the base of the "A" frame at the point "N." Attention is directed to the fact that "N" is very near the end of the base, and that the "resultant" is nearly at its critical angle.

Figure 3 of "B" is the same as figure 2, except the "Resultant" has been drawn so as to pass at the end of the

base of the "A" frame at which point the structure is then in equilibrium. A horizontal thrust of thirteen pounds in addition to that shown in figure 2 in a direction parallel with the base toward "N" placed the "A" frame in equilibrium about the point "N." A thrust as above in excess of thirteen pounds would cause it to overturn.

From the foregoing analysis represented by figures 1, 2 and 3, the conclusion is inevitable that a pull upon the hoisting line tended to overturn the "A" frame, that the weight of the "A" frame plus the weight of the suspended timber tended to stabilize the "A" frame, that the pull on the hoisting line opposed to the weight of the "A" frame plus that of the suspended timber brought the "A" frame into a condition approaching overturning, and that when the two men undertook to swing the suspended timber to one side a horizontal thrust in the direction of "N" was exerted upon the "A" frame at its apex, and when this force exceeded thirteen pounds it overturned.

It is therefore readily seen that when the resultant of forces acting on the "A" frame passed outside or to the left of its base, it immediately tilted about the point "N," that the lifting of the opposite leg left it free to revolve about the other leg at "N" which it did in seeking to re-adjust its center of gravity, finally overbalancing and simultaneously toppling sidewise and revolving horizontally.

Thus the analysis and behavior of the "A" frame by reason of its manner of support, the direction of pull on the hoisting line and resisting forces are in exact harmony with what the undisputed testimony shows took place.

As already suggested, plaintiff alleges negligence on the ground that there should have been three guy ropes supporting the derrick instead of two, and that the base of the derrick or "A" frame should have been longer. Defendant meets these charges of negligence with the counter charge that the hoisting line was attached to one side by fellow

servants of deceased, that deceased assumed all responsibility for such acts on the part of fellow servants and that deceased was possessed of equal knowledge with defendant of any danger or defect in said "A" frame.

From what has been said about the "A" frame it is perfectly apparent that it would not have overturned if it had been supported by three guys properly anchored, or if its base had been longer or securely attached, or if the hoisting line had been placed in a vertical plane passing through the guy line and through the center of the "A" frame. Failure to observe this principle in placing the hoisting line was primarily responsible for its overturning.

It is also apparent that the "A" frame would have been safe so long as the hosting line was placed in a vertical plane passing through the guy line and through the center of said "A" frame, but placed in any other position this factor or element of safety was reduced and the farther it was placed from the vertical plane as here indicated, the greater the danger became.

To uphold the contention of plaintiff in error is equivalent to holding that the deceased had knowledge of the physical condition and structure of the "A" frame and the danger attending its use as constructed or that he understood fully what would likely be the resultant and outcome of the forces applied to it as here outlined, that it had a very narrow area of safety, but that he assumed all risks incident thereto. We do not think such a holding is warranted by the record.

There is no evidence tending to show that the deceased had knowledge of or was forewarned as to the limited area of safety of the "A" frame, the danger attending its use, or that he understood what would likely be its behavior or the resultant and outcome of forces when applied to it in the manner as shown by the testimony.

The "A" frame was constructed by direction of the fore-

man on the job some two weeks before the accident, and there is evidence to the effect that its construction was in line with the practice for such construction prevailing in the community, but against this we are confronted with the irresistible fact of its very limited area of safety and behavior on the application of forces as shown, which area of safety could have been materially enlarged by lengthening the base, securing the base to the scaffold or properly fastening with an additional guy.

In the light of the showing made by the whole record we are brought to the conclusion that the "A" frame in question as constructed had a factor of safety below that of common practice, that it was an unsafe appliance or implement to work with, that reasonable precaution was not exercised to safeguard the life of the deceased and that it does not appear that he knew of or appreciated the danger to which he was subjected, or that such danger was so obvious that an ordinarily prudent man under the circumstances would have appreciated it.

An employee is not charged by law with the assumption of a risk arising out of defective appliances provided by his employer, unless his employment was of such a nature as to bring to his attention and cause him to realize and comprehend the dangers incident to the use of such appliances. The Supreme Court of the United States in Gila Valley, G. & N. R. Co. v. Hall, 232 U. S. 94, 34 Sup. Ct. Rep. 229, upheld a charge embodying this principle of law, the pertinent part of the opinion being as follows: "An employee assumes the risk of dangers normally incident to the occupation in which he voluntarily engages, so far as these are not attributable to the employer's negligence. But the employee has a right to assume that his employer has exercised proper care with respect to providing a safe place to work, and suitable and safe appliances for the work, and is not to be treated as assuming the risk arising from a

defect that is attributable to the employer's negligence, until the employee becomes aware of such defect, or unless it is so plainly observable that he may be presumed to have known of it. Moreover, in order to charge an employee with the assumption of risk attributable to a defect due to the employer's negligence, it must appear not only that he knew (or is presumed to have known) of the defect, but that he knew it endangered his safety; or else such danger must have been so obvious that an ordinarily prudent person under the circumstances would have appreciated it. *Union Pacific Railway Co. v. O'Brien,* 161 U. S. 451, 457; *Texas & Pacific Railway v. Archibald,* 179 U. S. 665, 671; *Choctaw, Oklahoma, &c. R. R. Co. v. McDade,* 191 U. S. 64, 68; *Texas & Pacific Ry. Co. v. Swearingen,* 196 U. S. 51, 62; *Burns v. Delaware & Atlantic Telegraph Co.,* 70 N. J. Law, 745, 752.''

The fellow servant rule was first announced in this country by the Supreme Court of South Carolina in 1841 in Murray v. S. C. Rail Road Company, 1 McMullan (S. C.) 385, and was affirmed by the Supreme Court of Massachusetts the following year in Farwell v. Boston & Worcester Rail Road Corporation, 4 Met. (Mass.) 49. Priestly v. Fowler, 3 M. & W. 1, decided in England in 1837 is often cited as the first case declaring the rule, but this case did not directly involve the question of the liability of the master to a servant for the negligence of the fellow servant. It does not appear that Priestly v. Fowler was called to the attention of the South Carolina court, though both Priestly v. Fowler and Murray v. S. C. Rail Road Company were referred to by the Massachusetts court.

The South Carolina and Massachusetts cases have greatly influenced the course of decisions on this question both in our country and in England, but so far as we have been able to learn from an exhaustive search all hold that the servant has a right to assume that the master has used due

diligence in providing suitable appliances or implements for the operation of his business and does not assume the risk of the mployer's negligence in making such provision. It is true that a servant who continues without objection in his master's employ with knowledge of a defective appartus assumes the hazard incident thereto, but unless the evidence clearly shows the assumption of the risk, it is a matter properly left to the determination of the jury.

We understand the doctrine of assumption of risk to extend only to those risks and hazards ordinarily and usually incident to the employment voluntarily engaged in, that is to say risks such as he knows to exist, or may know to exist by ordinary care. It does not extend to risks created by the negligent act of the master.

In Davis Coal Co. v. Polland, 158 Ind. 607, 62 N. E. Rep. 494, it was said that assumption of risk is a matter of contract. Contributory negligence is a question of conduct. If a servant would be defeated of a right of recovery for an injury by the rule of assumed risk it would be because he agreed, long before the accident happened, that he would assume the very risk from which his injury arose. If he were to be defeated by the rule of contributory negligence, it would be because his conduct at the time of the accident and under all the attendant circumstances, fell short of ordinary care.

Westbrook v. Crowdus (Tex. Civ. App.), 58 S. W. Rep. 195, was a derrick case similar in many respects to the case at bar, and it was there held that where there was no evidence that a servant had any notice that a derrick was defective, or of the danger attending its use, a finding in an action against a master for injuries received by its fall, that the manner of its construction and the danger attending its use were as apparent to the servant at the time it fell, and prior thereto, as to defendant, is erroneous.

It was also held in Westbrook v. Crowdus that where a derrick was erected by experienced men, but was thereafter removed, under direction of the master by inexperienced workmen, and the master made no inspection to see whether it had been properly erected after removal, he was guilty of such negligence as rendered him liable to a servant for injuries received by its fall.

Gulf, C. & S. F. Ry. Co. v. Delaney, 22 Tex. Civ. App. 427, 55 S. W. Rep. 538, is another derrick case where a brakeman on a freight train was killed by the falling of two derricks placed on each side of the track and used by an independent contractor to unload heavy stones from the cars on the track. The derricks were fastened together by overhead wires and were kept in position by guy ropes fastened to fence posts, one of which was decayed. The fall of the derricks was caused by the breaking and pulling up of such posts. The court held the railroad company negligent.

We think the case at bar may safely rest on the authority of Westbrook v. Crowdus, and Gulf, C. & S. F. Ry. Co. v. Delaney, as there is no evidence showing that the deceased was advised, knew or appreciated the danger attending the use of the derrick as constructed which caused his death, and the record conclusively shows that the defendant was negligent in that it failed to see that the derrick or "A" frame was securely anchored when it was moved from place to place, including the place from which it fell.

As stated from another angle, we think the master was charged with knowledge of the narrow margin of safety of the derrick as constructed, and the danger attending its use, which danger and narrow margin of safety it was his duty to communicate to the deceased. It is not made to appear that this was done, while it affirmatively appears that little or no precaution was used to safely anchor the

derrick when it was moved in order to reduce the danger attending its use.

The theory upon which contributory negligence is held to preclude one from recovery in an action of this kind is that he was guilty of some imprudence in the premises and that this imprudence was partially or entirely the cause of the injury received. We find nothing in the record to support the defense of contributory negligence interposed in this case.

All who serve the same master, work under the same control, derive authority and compensation from the same common source, are engaged in the same general business, though it may be in different grades or departments of it, are fellow servants who take the risk of each other's negligence, and the master is not bound to indemnify one servant for injuries caused by the negligence of another servant in the same common employment as himself unless the negligent servant was the master's representative. Ingram-Dekle Lumber Co. v. Geiger, 71 Fla. 390, 71 South. Rep. 552; Prairie Pebble Phosphate Co. v. Taylor, 64 Fla. 403, 60 South. Rep. 114; South Florida R. Co. v. Weese, 32 Fla. 212, 13 South. Rep. 436.

Defendant invokes the foregoing or fellow servant rule as a defense here on the ground that the hoisting line or snatch block was placed by fellow servants of deceased in front of and to one side of the "A" frame, and its failure was primarily due to this fact. The statement of fact as carried in this defense is doubtless true; but the answer is that the master was negligent in furnishing the deceased with an implement to work with of such narrow margin of safety and not advising him of the danger incident to its use, or in not seeing to it that the hoisting line was at all times placed within the area of safety as already described in this opinion.

The questions raised in this case have been very thor-

oughly presented both at the bar and in brief by counsel for both sides. Many errors were assigned, all of which have been examined carefully, but on the whole record reversible error does not appear.

The judgment of the court below is therefore affirmed.

WHITFIELD, P. J., AND WEST, J., concur.

TAYLOR, C. J., concurs in the opinion.

ELLIS AND BROWNE, J. J., dissent.

ELLIS, J., dissenting:

The appliance with which the deceased and his fellow workmen were engaged at the time of the accident was an "A" frame derrick. The deceased helped to put it in place. It was used for raising heavy timbers from the ground floor to a height of thirteeen feet seven inches where they were to rest upon a scaffold preparatory to putting them in place.

The unsafety of the appliance, according to the statement of the majority opinion, consisted of three conditions: First, the insufficiency of the base of the derrick; second, the absence of a third guy rope; and third, the location of the snatch block.

According to the statement contained in the majority opinion the lack of a few inches in the scope of the derrick's base rendered the structure mechanically imperfect but not to such a degree that it would have been a dangerous or unsafe appliance if the workmen in placing it, among whom was the deceased, had not neglected to use a third guy rope or had not neglected to put the snatch block on the line of a plane at right angles to the center of the derrick's base.

The analysis of the derrick's movement, as made by the

statement in the majority opinion, shows that the derrick tilted on one leg while the other swung around in the direction of Mr. Lee, knocking him from the scaffold on which he was standing. It is said this occurred because the angles of force when the timber was lifted to the required height, about thirteen feet, moved laterally toward one leg of the derrick. Which means, that the center of gravity of the derrick when the weight was put upon it by the pull moved nearly outside the lateral base of the "A" frame. At that point the derrick was still in equilibrium, but when the timber was pushed by the workmen on the second floor, who were placing the timber in position, the derrick's center of gravity moved entirely outside its base causing it to tilt and swerve as stated.

But, as shown by the statement, the swerving of the derrick would not have happened if in removing the derrick and putting it in place the men engaged in that work had used a third guy rope; or had put the snatch block in its proper place, that is, at a point at right angles to the base of the derrick opposite its center or to some point within its base; or, after the timber had been raised to the required height, if one of the workmen had observed the lateral swing of the load and had refrained from giving it an additional impetus in the direction of its swing in an effort to place the timber in position.

It seems from the statement that if, instead of attempting under the circumstances to pull or shove the timber further along the line of its swing, he had ordered it to be lowered and the snatch block readjusted the accident would have been avoided, because it is stated that the additional force of thirteen pounds exerted in that direction shoved the point through which the resultant of attraction of gravity acted outside the base of the derrick.

If Mr. Lee and the others with whom he was working had attempted to use the instrument *without* a guy line their

negligence in so doing would have appeared to have been indisputable, but they neglected to use a third guy line, which was indispensable to the safety of the instrument in view of the fact that they had placed or intended to place the snatch block in the wrong position.

Now, it appears from the evidence that the workmen were provided with ropes and lines sufficient to make the derrick secure in its place while in operation. It was an instrument which was portable and had to be moved from place to place during the construction of the building. It was not a complicated machine but a simple instrument controlled by natural laws the same as a ladder, scaffold or any other convenience or instrument used in building. If a ladder negligently placed by a workman against a building falls due to his carelessness in placing it and he is injured while using it he cannot claim that the negligence was that of his employer. How may it be said with better reason that if he negligently places a derrick in position for use and is injured because of such negligence that it is the fault of his employer?

The instrument used in this case was very little more complicated than a ladder and is not a mysterious or enigmatical thing. It was a portable thing and was moved from time to time by the workmen as occasion required. Each time it was moved it had to be set up and fastened securely. The men understood the method of doing it. To be made safe for use in lifting heavy timbers it had to be stayed or anchored in place by sufficient guy ropes. This Mr. Lee and others placing the instrument failed to do. To avoid a lateral pull against the frame the snatch block, as shown by the majority opinion, should have been placed at a point at right angles to its base, preferably opposite the center. This the men placing the instrument negligently failed to do. When the weight was raised to the required height its lateral swing toward and near one leg

of the derrick was apparent, the danger must then have been evident, but instead of lowering the timber and readjusting the appartus the men handling the piece of timber pushed it farther in the direction of the lateral swing. As a result of the concurrence of these three acts, Mr. Lee lost his life.

It is stated in the majority opinion that the placing of the hoisting line at a point outside of a plane passing through the base of the "A" frame rendered the use of the derrick unsafe, but it is said that Mr. Lee could not be supposed to know the danger attending the use of the derrick under such conditions. It seems to me that to infer such lack of knowledge upon Mr. Lee's part is to deny to him the intelligence which is most certainly possessed by every ordinary adult person. Besides, Mr. Lee was a carpenter of experience and if he actually did not realize the danger which a lateral pull against the apex of the derrick would produce he had ocular proof of it so soon as the weight was lifted, because the line carrying the weight swerved toward the leg of the derrick upon which it turned.

The "limited area of safety" was made so by the men who put the derrick in position.

Mr. Burriss, a witness for the plaintiff, explained the method of handling and moving the derrick. He said that the moving of the derrick became necessary frequently as they finished one "bent" after another and then the "whole gang of us, sometimes Mr. Mattox would pitch in and help too, with the exception of two men, one on each guy to hold it and keep it from falling while we slided it along." They moved it a "couple or three feet at a time." They "always moved it standing up." "Mr. Lee was a member of that gang." When the accident occurred the derrick had just been, about twenty-five minutes before, set up in that location. "The accident happened the first

time the timber was hauled up in its then location; the first time they pulled up timber with it the accident occurred.''

All derricks are not in the form of the one used when the accident occurred in which Mr. Lee lost his life. They sometimes consist of a pole or spar set on end and secured by guys and carrying at the upper end a hoisting tackle. The area of the base of such a derrick and the location of the ''snatch block'' are unimportant factors in its safety as a hoisting device. A derrick consisting of an ''A'' frame with a lateral base of several feet is not, therefore, a less safe device. The danger of its use did not therefore lie in any fault of construction but, as the majority opinion states, in the failure to use ''an additional guy.''

The absence of a third guy line was obvious. The employer had provided an ample supply of ropes for the purpose. The failure to use at least three guy lines upon a derrick consisting of one upright pole or ''A'' frame is obvious to any ordinarily prudent person; but in this case there was present the additional factor of danger which consisted of the location of the ''snatch block'' through which the pull was exerted against the apex of the derrick in an angle outside of that formed by the guy line.

I think that the reception of evidence over defendant's objection that the derrick's frame, as constructed, was a dangerous or unsafe instrument was erroneous and constituted harmful error. The reception of evidence tending to show that if the snatch block had been properly placed in front of the derrick rather than several feet to one side there would still have been danger in its use, that is that there would have been an influence exerted tending to tip the derrick over, was erroneous and harmful. This point, I think, is shown to be well taken by the majority opinion which distinctly states it to be ''perfectly apparent'' that the derrick would not have overturned if ''the hoisting line had been placed in a vertical plane passing through the

guy line and through the center of the "A" frame. And the conclusion of the Court is reached by a study of natural laws applicable to the use of the derrick under the circumstances in which it was used. Witnesses were, therefore, permitted to testify adversely to the operation of natural laws of which the Court takes judicial notice.

There was error in admitting evidence over the defendant's objection tending to show that after the accident a foreman ordered three guy ropes to be used upon a similar derrick. The use of a third guy line upon a derrick, however, is so obviously important and necessary to its safety when in use, if the pull against it is to be in a plane at a different angle from that formed by the two guy lines upon it, that an ordinarily prudent person is presumed to apprehend it. In using the derrick in these circumstances, therefore, Mr. Lee assumed the risk. See Southern Turpentine Co. v. Douglass, 61 Fla. 424, 54 South. Rep. 385; German-American Lumber Co. v. Hannah, 60 Fla. 76, 53 South. Rep. 516.

I also think that the uncontradicted evidence in the case amply sustained the pleas of assumption of risk as this Court has frequently interpreted that doctrine. There were errors in the giving of certain charges which seemed to announce the issue to be whether the derrick had two guy lines instead of three and the absence of the third line was defendant's negligence, whereas the issue was whether the defendant had neglected to provide material for a sufficient number of guy lines.

There were other errors which I think were harmful, but those which I have endeavored to point out are sufficient, in my judgment, to require a reversal of the judgment which I think should be the order in this case.

BROWN, J., concurs.

## ON PETITION FOR REHEARING.

1. The duty of the master to furnish a reasonably safe place in which to work and reasonably safe and proper tools and appliances to work with is a continuing one. He cannot in the beginning furnish a safe place to work or tools to work with and later take them away, and by his action or otherwise substitute new or different ones that are unsafe and then escape liability, unless it be shown that the act of the servant was responsible.

2. The rule prohibiting the introduction of testimony as to subsequent repairs of machinery, appliances, places to work and tools to work with in personal injury suits applies generally to substantive evidence of such repairs. It is not applicable to evidence testing the credibility of a witness under the facts in this case.

Judgment re-affirmed.

TERRELL, J.—The plaintiff in error contends that the original opinion conceives the issue to be whether or not at the time of the accident resulting in the death of Lee the derrick was rigged with three guy ropes, whereas the issue should have been whether or not the plaintiff in error had furnished sufficient material to provide an appliance with sufficient guys.

We conceive the issue to be whether or not the master at the time of the accident had furnished the servant Lee a safe place to work and safe tools and appliances to work with, except as against the acts of the said servant or his fellow servant.

The duty of the master to furnish a reasonably safe place in which to work and reasonably safe and proper tools and appliances to work with is a continuing one. He cannot in the beginning furnish a safe place to work or tools to work with and later take them away and by his actions or otherwise substitute newer different ones that are unsafe

and then escape liability, unless it be shown that the act of the servant or fellow servant was responsible. The record shows conclusively that Lee was an inexperienced man on the job and knew nothing about the mechanics of the derrick and did not aid in its construction or operation.

In the original opinion, the court considered fully the distinction between the master's duty of provision and the servant's duty of operation and the circumstances controlling this relation. We think, however, that Crews was a vice-principal and his acts were the acts of the master. If the master originally performed his duty to provide and later at the direction of Crews, his vice-principal, by the removal of one guy, as was done in this case, the derrick was rendered an unsafe and different appliance by reason of which Lee was killed, the master is liable.

The introduction of testimony as to subsequent repairs by replacing the third guy after his death was not in contravention of the rule prescribed in Seaboard Air Line Ry. Co. v. Parks, — Fla. —, 104 South. Rep. 587. Crews had been asked on direct examination how many guys were customarily used on such derricks. His answer was that only two guys were used on all such derricks as he had seen, that three guys were used on the derrick in question for a while because the ropes were old and rotten and that when new rope was obtained, the three old guys were replaced with two new ones. On cross-examination he was asked whether or not he did not see a third guy put on the derrick so operated with three guys right after this accident. The response was that he did and he went on to explain at great length. This procedure was proper on cross-examination because it was not offered or received as substantive evidence of subsequent repairs as was true in the Parks case and besides it was proper to test the credibility of the witness Crews who had testified to the contrary on his direct examination.

The sole duty of Lee, the deceased, was to "land" the timbers when they were hoisted. The derrick as constructed and equipped by all known laws of mechanics governing its operation was an unsafe instrument or appliance. Lee was inexperienced and was not advised as to its danger in operation. It was, therefore, not only the duty of the master to advise Lee, but it was his duty to see that the derrick was properly constructed and equipped. This was not done.

Any inaccuracy as to the definition of a vice-principal could not have been harmful since the facts show conclusively that Crews was a vice-principal, and the damages awarded can in no sense be said to be excessive, so any inaccuracy in the charge of the court as to the elements of recoverable damages could not have harmed the plaintiff under the issue and evidence in this case.

Judgment reaffirmed.

WHITFIELD AND STRUM, J. J., concur.

ELLIS AND BROWN, J. J., dissent.

BROWN, J., dissenting:

I cannot bring myself to the conclusion of the majority, so ably presented by Mr. Justice TERRELL, that this judgment should be affirmed. My thought is that, in addition to the reasons for a reversal set forth in the dissenting opinion of Mr. Justice ELLIS, there appears the following: (1) the erroneous definition of a vice-principal contained in charge No. 18 given by the court at plaintiff's request; and (2) the misleading nature of the court's charge as to the elements of recoverable damages, which should have limited the same to the probable joint lives of the husband and

the widow, rather than basing same upon the life expectancy of the husband alone.

According to my understanding of the issues and the evidence, both these errors were material and prejudicial. I am authorized to say that Mr. Justice ELLIS concurs in these views.