71 So.2d 480 (1954)
BARTHOLF
v.
BAKER.
Supreme Court of Florida. En Banc.
March 19, 1954.
Rehearing Denied April 24, 1954.
*481 John E. Mathews, Jr., Jacksonville, for appellant.
Bedell & Bedell, Jacksonville, for appellee.
HOBSON, Justice.
This case originated in the Circuit Court in and for Duval County. The action is one for damages for personal injuries. The complaint charged that Bartholf was guilty of negligence in that he failed to provide for Baker a reasonably safe place in which to work. Answer was filed which denied the asseverated negligence and presented defenses (which are affirmative in character) of assumption of risk and contributory negligence. Consequent upon the jury's verdict in favor of Baker the court entered judgment in the sum of $20,000 against Bartholf. This appeal ensued.
Appellee Baker was employed to work in the dairy owned and operated by appellant Bartholf. He was assigned to duties inside the milking shed. One day about three weeks after he was employed the foreman who employed Baker directed him to help drive a cow into the barn. The cow was driven to a concrete ramp leading into the barn. She proceeded part way up the ramp. Baker was behind her and to one side. The cow, instead of going into the barn, turned around and charged toward Baker [as he expressed it, "she come at me"]. Baker stumbled and fell in an attempt to get out of her path. Before he could regain his feet the cow slipped and fell on his left leg, breaking Baker's ankle.
The gist of this action is that Bartholf failed to provide a reasonably safe *482 place for Baker to work. Specifically it is alleged that the negligence was in permitting this ramp to be "uneven". The jury was justified, upon its consideration of the testimony given concerning the circumstances surrounding the injury, in deducing or inferring that the "uneven" place in the ramp was a proximate cause of the injury. However, the fact that an injury occurred, as well as that a proximate cause thereof can be attributed to a condition of the ramp, does not impute negligence to Bartholf, the owner-employer. It must be shown that Bartholf was negligent in permitting this uneven condition to exist.
The purpose of this ramp was to provide the cows an easy means of ingress and egress into and from the barn. It is generally known that animals with hoofs oft-times slip when traversing an incline unless adequate footage is provided. It is not contended by Bartholf, however, that this particular uneven ledge was constructed for that purpose. Moreover, it did not substantially serve such purpose.
We recognize the fact that if the uneven ledge substantially served such purpose it would become immaterial whether the ramp was designedly or fortuitously so constructed.
It was the jury's prerogative, and not that of this court, to determine from all the facts presented to it whether the risk of injury to an employee was sufficiently great to over-balance the utility of the "uneven" ledge. Obviously the jury determined that the risk of injury to an employee was of such magnitude as to outweigh the dubious utility of the "uneven" ledge. See Restatement, Negligence, Section 291, et seq.
It appears from the evidence that this ramp was made up of two slabs of concrete apparently laid at different times and which did not fit together evenly. The so-called "uneven" ledge was thus created and from the evidence the jury had the right to believe that said ledge was slightly more than 1 1/2 inches in height and attributable to faulty construction. Had there been several or many such ledges it might be said that they substantially served the purpose of preventing the cows from slipping while traversing the ramp. One ledge of this type on a ramp, however, could serve to keep the cows from slipping only to a very slight or inconsequential extent or degree.
The question of negligence was for the jury because it hinges primarily upon a disputed state of facts and the facts which were not controverted were such that different minds might reasonably draw diverse conclusions from them.
The jury had the right to believe Baker's testimony that he had only been on the ramp one time and "had not paid no attention to it [the "uneven" ledge]." It also had the right to believe his testimony that he did not know the very pertinent fact (which the foreman did know) that the cow had just had a calf. It is a matter of common knowledge among those engaged in work around dairies and as tenders of cows that a fresh-calved cow, when separated from her offspring, usually uses every means at her command to return to her progeny. We are convinced that the jury was justified in deciding that Bartholf was negligent in permitting this "uneven" ledge to remain on the ramp and that he failed to provide a reasonably safe place for his employee, Baker, to perform the unusual duty of attempting, at the pressing directive of his boss, unwittingly to drive a fresh-calved cow separated from her calf, into the barn.
It was entirely appropriate for the jury to determine, as it evidently did, that the "uneven" ledge was the result of faulty construction; that Bartholf knew of its existence and failed to correct the condition and that he was guilty of failing to provide a reasonably safe place for Baker to work. The question of contributory negligence, Atlantic Coast Line R. Co. v. Gary, Fla., 57 So.2d 10, as well as that of assumption of risk, Wilson & Toomer Fertilizer Co. v. Lee, 90 Fla. 632, 106 So. 462, was properly submitted to the jury.
*483 Apparently appellant would have this court decide that Baker voluntarily went to the assistance of his foreman while the latter was attempting to drive the cow into the barn and in so doing he assumed the risk of injury. This we cannot do because the jury had the right to believe that Baker did not go of his own accord, but was instructed by the foreman who employed him to assist in driving the cow into the barn. Moreover, the jury had the right to consider the fact that Baker was about his ordinary duties in the barn when the foreman suddenly directed Baker to come to his (the foreman's) assistance and to infer that in carrying out the emergent command of his superior the appellee did not have the forethought and possibly did not have the opportunity to remove the rubber boots which he was wearing. It is customary for dairy hands whose usual duties are performed within the milking shed, the floor of which is frequently wet from washing and scrubbing for the sake of cleanliness, to wear rubber boots. The locomotion of an ordinarily agile person becomes clumsy when he is wearing rubber boots, which fact becomes poignantly evident when one is placed in the position in which Baker found himself as the result of obeying the exigent directive of his employer, delivered by the employer's agent  the foreman.
Moreover, the jury may have concluded that in attempting to assist the foreman in driving the cow into the barn Baker had stepped into some fresh cow dung which would make the sole of a rubber boot slippery and which, it is commonly known, is frequently found in cow lots and about dairy barns.
It is true that Baker testified he caught the heel of his rubber boot on the "uneven" ledge. However, the jury not only could, but should, have viewed the circumstances attendant upon the accident which caused appellee's injury in the light of human experience. Everybody knows that when a person trips on one foot, if there be nothing staunch onto which he can grasp, he instinctively attempts to regain his balance by placing his other foot upon solid ground. It was entirely appropriate for the jury to conclude that the appellee followed such uniform pattern and that the boot on the other foot was wet or dungy, hence slippery, in which event he could not avoid falling to the ground, nor could he extricate himself from his perilous position.
Baker did go help the foreman without objection but we do not believe that he was in a position, nor under the duty, to object because the person who directed him to aid in getting the cow into the barn was the foreman  Bartholf's agent and the person who employed Baker  and the jury had the right to believe Baker's testimony that his ordinary duties did not require him to traverse the ramp; he had only been over the ramp one time and that although he had seen the "uneven" ledge he had paid no attention to it. All of which obviously led the jury to the reasonable, if not inescapable, inference that he did not appreciate the risk involved. He knew of no reason to object to carrying out the clamant directive of his boss.
Voluntary exposure is the bedrock upon which the doctrine of assumed risk rests. Appreciation of the danger is an essential to the defense of assumption of risk, or of contributory negligence, as is knowledge of the condition which creates the peril.
We must bear in mind the important fact that the jury had the right, upon a consideration of all the testimony, to decide that the nature of the work which Baker was employed to perform was entirely different from that which he was called upon in an emergency to perform; that the place where the accident occurred was not the place furnished by the employer in which the appellee was expected to carry out his usual, customary and ordinary duties as an employee, and hence Baker was not in a position to comprehend the danger.
Although the question whether Bartholf was negligent is a close one, this court is not justified in substituting its *484 judgment for that of the jury or in reversing the learned Circuit Judge because he submitted this case to the jury, refused to grant a motion for a directed verdict at the conclusion of the plaintiff's case and denied a motion for a new trial. Unless there is no evidence in an action of this type from which the jury could reasonably infer negligence, the case should be left with the jury. So far as the defense of assumption of risk or that of contributory negligence is concerned, there is no doubt that the jury was entirely justified in deciding as it did, in favor of appellee.
Another and more serious question is presented by the challenge that the verdict is excessive. We have repeatedly held that we will not reverse a case for a new trial on the ground that the verdict is excessive, unless it appears upon a consideration of all the testimony that the verdict was so much greater than it should have been as to shock the judicial conscience. We have also held that the burden is upon the appellant to establish the fact that the verdict is wholly unsupported by the evidence or was the result of passion, prejudice or other improper motive. See First Federal Savings & Loan Ass'n v. Wylie, Fla., 46 So.2d 396.
On the other hand, we have never hesitated to reverse a case because of an excessive verdict if the verdict which was rendered is not even suggestively sustained by the evidence. When either a trial judge or this court determines that the verdict of a jury is so excessive as to shock the judicial conscience someone invariably accuses either or both of usurping a prerogative of the jury and substituting the court's judgment for that of the jury, thus tending to disparage our system of trial by jury. We are inclined to answer such suggestion by quoting from the case of Virginian Ry. Co. v. Armentrout, 166 F.2d 400, 408, 4 A.L.R. 2d 1064, wherein the Circuit Court of Appeals of the Fourth Circuit, speaking through Judge Parker, said:
"It is for the jury to fix the amount but they must do this within the bounds of reason, and a verdict on which the mere interest at 3% amounts to more than five times the maximum allowed by the state compensation laws and $1,800 per year more than the judge estimates the loss of adult earning power is manifestly too much.
"The power and duty of the trial judge to set aside the verdict under such circumstances is well established, the exercise of the power being regarded as not in derogation of the right of trial by jury but one of the historic safeguards of that right. Smith v. Times Pub. Co., 178 Pa. 481, 36 A. 296, 35 L.R.A. 819; * * *. The matter was well put by Mr. Justice Mitchell, speaking for the Supreme Court of Pennsylvania in Smith v. Times Pub. Co., supra, 178 Pa. 481, 36 A. 298, as follows: `The authority of the common pleas in the control and revision of excessive verdicts through the means of new trials was firmly settled in England before the foundation of this colony, and has always existed here without challenge under any of our constitutions. It is a power to examine the whole case on the law and the evidence, with a view to securing a result, not merely legal, but also not manifestly against justice,  a power exercised in pursuance of a sound judicial discretion, without which the jury system would be a capricious and intolerable tyranny, which no people could long endure. This court has had occasion more than once recently to say that it was a power the courts ought to exercise unflinchingly.' (Italics supplied.)"
We have carefully considered the testimony in this case with reference to the extent of Baker's injuries and have concluded that the verdict in the sum of $20,000 is excessive. Baker was a man 59 years of age at the time of his injury, or at least at the time he testified in this case. The maximum amount which he was earning, including his salary, the reasonable value of the rental of the house he occupied and the 2 quarts of milk a day which he received from Bartholf, was a little over *485 $2,800 per year. His life expectancy was 15.61 years. If he had been totally and permanently disabled the present worth of his loss of future earnings would be over $30,000. However, the testimony shows that at the time of the trial he only had a 90% disability of his ankle. If he should decide to have a fusion operation performed, which was advised by the orthopedic surgeon who attended Baker and who testified in this case, such operation would cost $500 and he would lose a little more than $1,400 in earnings because he would be unable to work after the operation for a period of approximately six months. Up to the time of the trial Baker lost in income approximately $1,157. His medical and other expenses occasioned by the accident amounted to $374.30.
Upon a consideration of these figures, we conclude that the verdict of $20,000 including a sum for pain and suffering of at least $15,000 is excessive, not only because the proof of pain and suffering is meager but also because of the medical testimony to the effect that if the fusion operation is performed it will "offer him a stable ankle" and alleviate the pain in the ankle, albeit some pain might develop in other joints of Baker's foot. The fusion operation would leave Baker with a limp but we find no evidence to the effect that he would be unable to carry on his usual occupational duties.
Although Dr. Raybin testified "there won't be normal use of the limb, but he will be able to use it and get around with it", (italics supplied) there is no substantial evidence which tends to show to what extent, degree or percent, if any, Baker's earning capacity will be impaired. This is a matter which cannot properly be determined, even by a jury, upon mere speculation or conjecture.
This cause is remanded to the circuit court with directions that the able trial judge enter an appropriate remittitur which he is in better position to do than are we because he heard all of the testimony and, in effect, sat as a seventh juror. If in the opinion of the trial judge it should be impossible for him to fix and determine a proper amount of remittitur, then in the alternative, he is directed to grant a new trial on the question of damages only.
TERRELL and THOMAS, JJ., and WALKER, Associate Justice, concur.
ROBERTS, C.J., and SEBRING and DREW, JJ., dissent.
SEBRING, Justice (dissenting).
I cannot agree with the conclusion of the majority. As I read the record, the facts of the case are simple and fail to establish liability on the part of the defendant.
The defendant owned and operated a dairy farm on which he maintained several hundred head of cattle. Leading into his dairy barn was an inclined concrete cattle ramp which had been poured in two separate slabs or sections. At the time of the accident complained of, one of the slabs which had been poured at a later date was slightly lower than the other.
From the plaintiff's testimony it is shown that he had worked as a farmhand, and around dairy barns, for many years and had had a great deal of experience in handling cattle. He had started to work for the defendant as a farm laborer between two and three weeks prior to the accident. His general duties required him to work at the dairy barn feeding cows and carrying milk to the milk shed. He knew of the unevenness existing in the cattle ramp but had "paid no attention to it." Moreover, he knew that the ramp was made of concrete, and he had never seen a concrete ramp on which cows would not slip or lose their footing. As he explained it, "That is one reason they have it rough, so they won't slip when is raining."
Immediately prior to the accident the plaintiff was working in the barn cleaning *486 up trash which lay on the floor. While he was engaged in this chore the foreman of the dairy called to the plaintiff for help to drive a cow from an adjacent lot into the barn. He went to help the foreman without objection. When he and the foreman finally got the cow on the ramp leading into the barn, he waved his arms and attempted to "shoo" her through the doorway. At this point the cow suddenly turned and tried to get back down the runway. Finding himself directly in her path the plaintiff stepped back, and as he did so, the heel of his rubber boot caught on the uneven edge of the ramp where the two slabs met and he tripped and fell.
After he had fallen and before he could regain his footing, the cow, which was then some feet away, lost her footing, slipped to the concrete floor of the ramp, and slid forward onto the plaintiff and broke his ankle.
The cow did not run into plaintiff. He "fell down trying to get away." He suffered no injuries from the fall. The injury occurred by reason of the fact that the cow slipped while still some distance away from him in such a manner as to cause her to come into contact with the plaintiff.
The question is whether upon this evidence, which has been stated here in the light most favorable to the plaintiff, the trial court committed reversible error in refusing to grant the motion for a directed verdict or the motion for a new trial.
After due consideration of the records and briefs, I am unable to convince myself that the defendant negligently failed to provide the plaintiff a reasonably safe place to work by permitting the concrete ramp leading into the barn to "become cracked, broken and uneven." While it has been stated broadly that the master has a positive duty to furnish his servant with a safe place wherein to do his work, the true rule is that a master is not an insurer of the safety of the place furnished, nor is his obligation to furnish a safe place to work an absolute one. Seaboard Air Line R. Co. v. Gentry, Fla., 46 So.2d 485; Meridian Grain & Elevator Co. v. Jones, 176 Miss. 764, 169 So. 771. He is liable only for the failure to exercise ordinary and reasonable care to provide a reasonably safe place to work under the circumstances of the employment. W.B. Harbeson Lumber Co. v. Anderson, 102 Fla. 731, 136 So. 557; Holstun & Son v. Embry, 124 Fla. 554, 169 So. 400; Seaboard Air Line R. Co. v. Gentry, Fla., 46 So.2d 485. Whether the master has exercised ordinary and reasonable care in a particular case depends very largely upon the nature of the work to be performed, the reasonable suitability of the place furnished for that work, and the experience, maturity, intelligence and discretion of the servant. Tampa Shipbuilding & Engineering Co. v. Thomas, 131 Fla. 650, 179 So. 705; 56 C.J.S., Master and Servant § 203. Manifestly, the obligation of an owner and operator of a dairy farm to use ordinary and reasonable care to provide his farm laborers with a reasonably safe place wherein to work in pursuance of the discharge of their ordinary duties is quite different from the obligation toward its employees that would rest upon a business requiring the use of elaborate techniques or complicated or dangerous tools or machinery.
In the instant case the evidence was that the difference in the levels of the two slabs of the concrete ramp over which the plaintiff tripped and fell could not have been more than one and one-half inches. Indeed, on cross-examination, the plaintiff conceded that the difference in the levels was only "about an inch  like a shoeheel." I have grave doubts that proof of this situation amounted to establishment of the fact that the defendant failed to use ordinary and reasonable care to provide for the plaintiff, employed as a farm laborer, a reasonably safe place at which to perform the duties that devolved upon him.
On facts basically analogous to those in the case under consideration, it has been held that an employer was as a matter of law not negligent in furnishing a working platform surface which was somewhat uneven by reason of raised knots in the boards of which it was constructed, and over which an employee fell in alighting from a train. Crowder v. Chicago & A. Ry. Co., 145 Ill. App. 556. *487 Similarly, an employer was not negligent in permitting the use of a splintery surfaced walkway, on which his employee was seriously injured. "To hold that it was a duty the defendant owed its employes to tear up this structure on account, alone, of the splinters that had been produced on its surface, and replace it with a new one, in order to avoid liability in a case of this kind, is, we think, going too far. Before the plaintiff is entitled to recover, we must hold that it was a duty the defendant owed him to furnish him a platform which was not only reasonably safe, but absolutely so; and this we are not authorized to do." Wendall v. Chicago & A. Ry. Co., 100 Mo. App. 556, 75 S.W. 689, 691. See also McLaughlin v. Atlantic Mills, 27 R.I. 158, 61 A. 42.
In my opinion, the record does not reflect any failure on the part of the defendant to conform with the usual or customary standards among dairymen in the community in respect to the safety of the ramp's surface. Nor was there any question of defective lighting or lack of visibility. The photographs put in evidence by the plaintiff plainly indicate that the imperfection, where the two slabs of concrete came together to form the ramp, was a slight one. Certainly, in the ordinary uses to which such an inclined ramp would be put the surface thereof would not constitute a hazard. While, according to the plaintiff's own version of the accident, the injury occurred in an emergency situation created when the cow he was attempting to "shoo" into the barn turned on him in an attempt to get back to the lot, he acknowledged, on cross-examination, that it would be impossible to build a concrete ramp on which cows would never slip. If this testimony is to be taken at face value, I think it must follow that it would also be virtually impossible to maintain an inclined concrete ramp on which a dairy laborer shod in heavy rubber boots would not be likely to fall if he stepped down it backwards in a hasty attempt to get out of the path of an oncoming animal.
Thus, taking the evidence presented by the plaintiff in the light most favorable to him, I have the view that it cannot be reasonable inferred that the defendant was derelict in his duties in permitting the use of such a ramp in his dairying operations, or that the happening of the plaintiff's injury can be attributed to any fault or breach of duty on the part of the defendant. However, assuming for the sake of argument only that the defendant was guilty of some negligence in failing to maintain the surface of the concrete ramp in a smooth and perfect condition, there is yet another valid defense which must bar the plaintiff from recovery.
There is no question of the fact that the plaintiff had actual knowledge of the condition of the surface of the inclined ramp before the accident happened. He contends, however, that although he had seen the ledge he had paid no particular attention to it and therefore did not realize or become cognizant of any danger confronting him before he went to assist the foreman in attempting to drive the cow into the barn.
It is so well established as hardly to call for any citation of authority that a servant assumes not only all ordinary risks of his employment but also all of the extraordinary risks, that is, those due to the master's negligence, of which he knows and the danger of which he appreciates. Labatt's Master & Servant, 2nd ed., Vol. 3, sec. 897. From our own cases, as well as from the general authorities, it is clear that the test for determining whether the employee "appreciates" the danger is not a subjective but an objective one; the true question being whether the danger was of such a nature that an ordinarily prudent person under the circumstances would have appreciated it. Gallespie v. Thornton, 95 Fla. 5, 117 So. 714; Wilson & Toomer Fertilizer Co. v. Lee, 90 Fla. 632, 106 So. 462. "If a servant * * * discovers that the instrumentalities furnished for his use are defective, and understands or by the exercise of ordinary observation ought to understand the risk to which he is thereby exposed * * * he cannot recover for injuries resulting therefrom." Labatt's Master & Servant, sec. 1183, p. 3180.
*488 While it is true that the question of assumption of risk should be left to the jury where the facts are disputed or where different inferences may be drawn, German-American Lumber Co. v. Brock, 55 Fla. 577, 46 So. 740, it is also true that where it appears that "the employee had knowledge of, and appreciated, the danger or that the danger was so obvious or apparent that knowledge should be imputed to him, then the court may declare as a matter of law that the employee assumed the risk and is not entitled to recover." 35 Am.Jur. Master & Servant, sec. 299, p. 724. In such cases the doctrine to be applied is that "the action must be declared not to be maintainable as a matter of law if the evidence leaves no reasonable doubt that the servant comprehended the risk which caused his injury." Labatt, sec. 897; see also Gordon v. Gandy Bridge Co., 150 Fla. 28, 7 So.2d 350, and South Florida R. Co. v. Weese, 32 Fla. 212, 13 So. 436.
In the instant case the alleged defect was not one from which hidden dangers would naturally flow, Wilson & Toomer Fertilizer Co. v. Lee, supra; Winter Park Tel. Co. v. Strong, 130 Fla. 755, 179 So. 289; it was simply an uneven surface, a small ledge on an inclined concrete ramp over which cows were driven into the barn to be milked. The only possible danger it presented was that in the course of using it for driving cows, or walking on it for other purposes, a cow or a person might trip. Thus, an ordinarily prudent person, certainly anyone like Baker who, by his own admission, was an experienced dairyhand, should have appreciated this danger. Since Baker had seen the existing ledge on at least one prior occasion, and hence had ample time to consider its possible potentials for danger, it is immaterial that when he was confronted with an emergency at a later time, that is, after he had voluntarily gone to the assistance of the dairy foreman, he did not then have the opportunity to exercise his choice as to whether he would proceed with the work he had been requested to do or decline on the ground that to engage in the work required him to face a potential hazard.
The so-called emergency situation which the plaintiff suggests was sufficient to take him out from under the doctrine of assumption of risk occurred in the performance of ordinary work around a dairy farm. Baker knew that the cow he was about to drive would not go voluntarily from the cow lot into the dairy barn. It was for this very reason that he had been called by the foreman to assist the latter in driving the animal. Being an experienced farmhand who had worked for many years with cows, it seems obvious that Baker knew or was charged with knowledge of a fact known to every farmer who has cattle  that when you try to pen a cow that doesn't want to be penned, she is likely to turn and try to effect an escape. That this is exactly what the defendant's cow was trying to do while being driven up the rampway is evidenced, we think, by Baker's own testimony to the effect that he was waving his arms and trying to "shoo" the cow into the barn prior to the time she turned and started down the runway.
Being charged with knowledge of such a propensity of cattle, Baker nevertheless complied with the request of the foreman without registering any objection, voluntarily placed himself on the ramp in what he now claims was a position of peril inspired by the negligence of the defendant, and without watching where he was stepping (his testimony in this regard being that he "was watching the foreman"), stepped backward against an uneven ledge which he had previously observed, and suffered subsequent injuries not from his own fall but from the unfortunate coincidence that the cow slipped and fell several feet away and thereafter collided with the prone body of the plaintiff.
Upon the facts stated I think it plain that the plaintiff voluntarily assumed the risk which occasioned his injury, and that as a matter of law he should be precluded from a recovery. In my opinion the judgment *489 appealed from should be reversed with directions that a judgment be entered in favor of the defendant.
ROBERTS, C.J., and DREW, J., concur.