WINTER PARK TELEPHONE COMPANY, a corporation, v
J. I. STRONG.

179 So. 289.
Opinion Filed October 20, 1937.

757

*E. W. & R. C. Davis, Pleus, Williams & Pleus* and *C. A. Boyer,* for Plaintiff in Error;

*Giles & Gurney,* for Defendant in Error.

CHAPMAN, J.—The parties to this suit in this opinion will be referred to as they appeared in the lower court as plaintiff and defendant. On the 2nd day of December, 1935, plaintiff filed in the Circuit Court of Orange County his declaration consisting of nine counts. Counts 1, 2 and 3

charge a negligent injury to plaintiff on the 17th day of February, 1934, while the remaining counts of the declaration allege a second injury to the plaintiff on the 27th day of June, 1934. It is not necessary to consider the issues submitted under counts 4, 5, 6, 7, 8 and 9 because the jury found a verdict in behalf of the defendant and no assignment of error is predicated thereon. The first count alleges that the defendant was engaged in the telephone business and that plaintiff was its employee engaged in repairing wires on a pole; that the defendant negligently permitted a high voltage of electricity to run into and charge the telephone wires and that plaintiff was thrown from the pole and injured. The second count alleges that the defendant negligently and carelessly permitted a high and dangerous voltage of electricity from wires of the Florida Public Service Company to run into and charge the telephone wires and that plaintiff was thereby injured. The third count charges that the defendant negligently and carelessly sent and transmitted a dangerous voltage of electricity through the wires and that plaintiff was thereby injured.

The defendant filed pleas to each of the aforesaid counts, being (a) general issue; (b) payment of the sum of $1,359.04 to plaintiff as full payment; (c) a release signed by the plaintiff for and in consideration of $1,359.04 and a discharge from any and all liability connected with said alleged injuries; (d) for a valuable consideration in the sum of $1,359.04 plaintiff executed and delivered to plaintiff a written obligation commonly known as a covenant not to sue. The plaintiff filed a joinder of issue on the pleas, likewise a replication denying the release and covenant not to sue to be the deeds of the plaintiff; likewise the release and covenant not to sue was obtained from the plaintiff when he was not in possession of his mental faculties, and other replications unnecessary to recite.

During the month of· November, 1936, the issues were submitted to a jury and a verdict was found for the plaintiff in the sum of $18,750.00. The defendant filed a motion for a new trial and the same was on the 9th day of December, 1936, overruled and denied. A judgment final was entered on the aforesaid verdict in behalf of the plaintiff and writ of error was obtained and the suit is here for review and a number of assignments of error are urged for a ·reversal.

This suit was brought under what is commonly known as the Hazardous Occupation Act, being Sections 7059, 7060 and 7061, Comp. Gen. Laws of Florida, 1927. The first assignment of error by defendant is: If the servant had supervision of and assisted in the construction of a place to work and by reason of faulty construction thereof he is injured, may he recover therefor?

In support of this assignment counsel for defendant in their brief recite:

" 'I set this pole (the one in question) here in 1929. I had to take care of the wires leading to the stucco building.' 'I. reached outdoor superintendent in 1925.' 'My duties as outdoor superintendent were lineman, general plant man, switchboard man, construction installer. My duties were to string wires and in the event of trouble, to correct it, and I had supervision of the outside plant.' 'I was to notify Mr. Galloway about anything that wasn't right.' "

The record shows that the plaintiff during the years 1929 and 1930 directed the construction or assisted in the construction of the telephone system of the defendant, including the wiring of the pole where the injury occurred. It is in the record and supported by a number of witnesses that the telephone wires of the defendant were on a pole "jointly" with the Power Company. distributing electricity in that community. Some of the witnesses testified that the wires

were not up to "standard" construction in that they were placed in close proximity with the electric wires and the wires coming in contact with each other permitted and allowed electricity to escape and electrify the telephone wires of the defendant. While the improper placing of the telephone wires at close proximity with the electric wire on the same pole may have been one of the causes of the injury to the plaintiff here, a review of the evidence shows other opportunities for the charging of the telephone wires existed, such as a contact at some distance from the pole of the charged wire and telephone wire; likewise wet moss suspended from the live or charged wires down and contacting the telephone wires; also the live wire feeding the arc came in about $2\frac{1}{2}$ inches of a telephone wire connection.

It is urged here as the duty of the defendant to inspect at proper intervals the entire equipment of the telephone company to see that its property is safe for all having business to go about it. If the jury found that plaintiff had knowledge of the defective construction of the telephone wires at this particular pole at the most the amount of recovery therefor would be reduced as authorized by statute, but if this pole was unsafe for the plaintiff who may have had some knowledge thereof, it would be unsafe for any other employee in an effort to repair the wire. Some time had passed after construction and before plaintiff had been required to regulate the trouble at the pole where injured. The plaintiff as a matter of law was entitled to a reasonably safe place in which to work. In the suit of Kirkland v. City of Gainesville, 122 Fla. 765, text p. 776, 166 Sou. Rep. 460, it was said:

"Plaintiff's decedent was an agent or employee of the defendant city, and it is not shown that the defendant city 'exercised all ordinary and reasonable care and diligence' to maintain its line pole in safe condition for the hazardous

service in which it was used. Even if some responsibility for looking after the condition of the pole was conferred upon and assumed by the decedent, and even if decedent may be regarded as negligent in going upon the pole, this did not relieve the city of the consequences of its negligence in performing its duty to maintain the pole in a reasonably safe condition for the hazardous service; and the negligence of the city being shown and the decedent not having assumed the risk of the city's negligence, there may be a recovery of damages to be diminished in proportion to the negligence, if any, of decedent, it not being shown that the injury was 'caused by' decedent's 'own negligence.' Sestions 7059 (4972), 7061 (4974) C. G. L."

Likewise the utterance of this Court in the case of Stearns and Culver Lumber Co. v. Fowler, 58 Fla. 362, text p. 368-369, 50 Sou. Rep. 680, when it was said:

"A master assumes the duty toward his servant of exercising reasonable care and diligence to provide the servant with a reasonably safe place at which to work, with reasonably safe machinery, tools and implements to work with, with reasonably safe materials to work upon, and with suitable and competent fellow servants to work with him; and when the master has properly discharged those duties then, at common law, the servant assumes all the risks and hazards incident to or attendant upon the exercise of the particular employment or the performance of the particular work, including those risks and hazards resulting from the possible negligence and carelessness of his fellow servants and co-employees."

The second question urged here by counsel for defendant is: If the servant is superintendent of the master's business and it is his duty to inspect the property and appliances and remedy defects in the construction, may he recover damages for injuries caused by a defective condition which

he knew or should have known existed? The record shows plaintiff and the defendant's president, Mr. Galloway, worked together from time to time on defendant's properties. He worked under Mr. Galloway and helped to construct or hang the wires in question, but there was not granted plaintiff by the terms of his employment discretion about the places and manner of stringing the wires, but followed such instructions and directions as given in 1929 and 1930 when the wires were placed on the pole in question. The selection of the material and the exact place on the pole in question where the wires of the defendant were to be placed is not shown to have been granted by the defendant to the plaintiff under the terms of his said employment. While it is true that the defendant had the control and supervision of the pole and wires in question from 1929 or 1930 until the time of the injury in February, 1934, and the duty to inspect and keep in good condition not only the equipment on this particular pole but all of its said property. The fact that the plaintiff should have had some knowledge of the condition of the wiring on this particular pole and that he knowingly went upon it in the course of his said employment would not preclude him from a recovery herein, neither would it be a bar to this action as the statute authorizes a recovery but apportions the amount therefor according to the negligence of the parties. See Kirkland v. City of Gainesville, *supra*. The jury considered and determined the facts involved in this assignment.

The third question presented here is: When the master supplies safety appliances for the servant's protection which the servant fails to use and is injured in consequence of such failure, is the master liable therefor? This assignment is largely one of fact settled by the jury with the proper instruction on the law applicable thereto. It is true that logical arguments can be used on each side of the question as

to whether or not plaintiff would have been injured had he used a safety belt. Plaintiff asserts that his life was saved for this very reason and argues that he would not have fallen when receiving the shock if he had had the belt and the electricity would have killed him, but when permitted to fall and not being fastened to the pole by the belt is the reason his life was saved. It seems that the jury settled this question, being one of fact and no error of law or charge to the jury by the court having been made to appear.

The fourth question presented is: When an injured employee executes a release under seal, is its effect sufficiently overcome by his unsupported testimony that he thought it was a receipt?

Plaintiff was injured on the 17th day of February, 1934, and remained in the hospital for a few weeks and then moved to his home. On April 18, 1934, he received a phone message to go to the telephone office where he had been employed for a number of years prior thereto, and upon reaching the office was introduced to a Mr. Crabtree, a representative of an insurance company carrying the insurance on the employees of the defendant. He signed the release and acknowledged payment as shown by one of the defendant's pleas. It was witnessed by the president of defendant company and his said son. The plaintiff at the time was convalescing from some three or four skull fractures, a broken arm and other serious wounds as a result of his fall from defendant's pole. Dr. McGugan testified his mind was in bad condition and had been since the fall and it was abnormal at the time of the trial in the lower court. It was a jury question whether the release and settlement signed by the plaintiff was based on a sufficient consideration. See Florida Power & Light Co. v. Horn, 100 Fla. 1339, 131 Sou. Rep. 219; Douglas v. Ogle, 80 Fla. 42, 85 Sou. Rep 243. In the suit of Florida East Coast R. R. Co., v. Thompson, 93

Fla. 30, text pages 34 and 35, 111 Sou. Rep. 525, this Court said: ·

"A contract procured through fraud is never binding upon an innocent party thereto. As to him, such contract is voidable; as to the wrongdoer it is void. If a party to a written release of liability for personal injuries was induced to sign it by false and fraudulent representations either as to the nature or extent of his injuries or as to the contents, import or legal effect of the release, and he himself innocently and justifiably relied upon such representations to his detriment and was guilty of no negligence in failing to ascertain the true facts, he is not bound by such release. This Court will not hesitate to set aside and void a release so procured. But fraud is never presumed. It must be established by the evidence, and the burden is upon him who asserts it. Columbus Elec. Power Co. v. Downs (Ala.), 106 South. Rep. 593; Aderholt v. S. A. L. Ry. Co., 67 S. E. Rep. 978; St. Louis & S. F. R. R. Co. v. Bruner, 152 Pac. Rep. 1103. See also Sommers v. Apalachicola N. R. R. Co., 85 Fla. 9, 96 South. Rep. 151; Dova v. Hancock, 88 Fla. 503, 102 South. Rep. 642; Green v. First Natl. Bank, 85 Fla. 51, 95 South. Rep. 231; Glass v. Craig, 83 Fla. 408, 91 South. Rep. 332. The burden resting upon the releasor to escape the legal effect of a formal written release, such as the one here involved, is a heavy one. Borden v. Sandy River & R. L. R. Co., 86 Atl. Rep. 242. The existence of fraud will not be assumed upon doubtful or vague parol evidence, especially where there is substantial credible evidence to the contrary. Fivey v. Pennsylvania R. R. Co., 52 Atl. Rep. 472, 23 R. C. L. 417 (48); 10 R. C. L. 897 (46-47); Zdancewicz v. Burlington Traction Co., 71 Atl. Rep. 123."

Question (5): When an injured employee executes a release under seal, is its effect sufficiently overcome by his unsupported testimony that he did not know it was a re-

lease, particularly where the releasor admits that he endorsed the draft in payment of the consideration therefor after being informed that he had executed the release and does not return to the lender the consideration therefor?

This is similar to the last previous question. The testimony of the mental condition of the plaintiff was for the jury. The money in question went to pay the expenses of his partial recovery and a small sum only was left to him. The draft was by the plaintiff endorsed and delivered to the defendant and by inference his hospital and other bills were by the defendant paid with these funds. It cannot be asserted here that plaintiff was in possession of his faculties and equipped to protect his rights here at the time of signing the release. It cannot be overlooked that the plaintiff had three or four skull fractures, a broken arm, had been in the hospital for several weeks, unable to work, physically unsound and under these conditions and circumstances the release was obtained. It is true the evidence offered on this point was by the defendant sharply contradicted, but the same was submitted to the jury by the lower court with appropriate instructions. See Florida Light & Power Co. v. Horn, 100 Fla. 1339, 131 Sou. Rep. 219; Douglas v. Ogle, 80 Fla. 42, 85 Sou. Rep. 243; Florida East Coast R. R. Co. v. Thompson, 93 Fla. 30, 111 Sou. Rep. 525.

It appears that the same evidence and citation of authorities in support of assignments 4 and 5 are applicable to assignments 6 and 7 argued in defendant's brief. It has not been made to appear that the jury hearing the evidence and rendering its verdict were actuated by motives or intentions not supported by the evidence. It is true that the jury accepted the statements of the plaintiff and his witnesses in preference to the statements of the witnesses for the defendant and in so doing acted within its province. The lower court properly instructed the jury upon the law of the

case and its findings in this issue was conclusive. Florida Power & Light Co. v. Horn, 100 Fla. 1339, 131 Sou. Rep. 219; Douglas v. Ogle, 80 Fla. 42, 85 Sou. Rep. 243; Florida East Coast R. R. Co. v. Thompson, 93 Fla. 30, 111 Sou. Rep. 525.

Plaintiff here had been an employee of the Winter Park Telephone Company and had been such from about 1920 until the time of his injury in February, 1934. Plaintiff and Mr. Galloway had worked on this system for a number of years. During this period he had worked under the president of the company, viz.: Mr. Galloway. On the morning of the injury plaintiff undertook to correct a disorder appearing among the telephone wires on the pole from which he later fell. After climbing the pole he attempted to open an iron box of the defendant and in so doing received a voltage and continued to receive it until he managed to extricate himself therefrom and fell to the brick pavement, striking it on his head and shoulder and producing some three or four skull fractures, a broken limb, a disorderly nerve system and was a physical wreck. The injuries of the plaintiff were not denied or that he received the same upon defendant's telephone pole while working in his line of duty. There is a conflict, however, as to electricity escaping from the power company's line into the wire of the defendant company. Plaintiff established by some three or four witnesses the means and methods by which electricity was transmitted into the wires of the defendant. The evidence showed original defective construction, not up to standard requirements, and that contacts from the electric wires to the defendant's wires could have occurred in two or three ways. The defendant asserts that the plaintiff had a knowledge of the defective construction of the wires on the pole, it was his duty to keep the same in good repair and with the exercise of reasonable care should have learned of

the charged wires, if any, appearing on the pole. Likewise, there was conflict in evidence as to pleas of payment, release and covenant not to sue, the defendant contending that these instruments were *bona fide* and a bar to plaintiff's recovery, while plaintiff asserts that the instruments set up in the pleas in the way of bar were without consideration and obtained under improper circumstances and conditions from the plaintiff. These issues were properly settled by the jury under appropriate instruction by the court. See Cameron & Barkley Co. v. Law-Engle Co., 98 Fla. 920, text p. 923-4, 124 Sou. Rep. 814:

"When there is some substantial evidence to support a verdict for one party, a verdict for the other party should not be directed by the court on the ground that a preponderance of the evidence is favorable to the movant. F. E. C. R. Co. v. Hayes, 66 Fla. 589, 62 So. Rep. 274.

"If the evidence is conflicting or will admit of different reasonable inference, or if there is evidence tending to prove the issue, it should be submitted to the jury as a question of fact to be determined by them, and not taken from the jury and passed upon by the court as a question of law." Williams v. Sherry, 94 Fla. 998, 114 So. R. 849. See also Davis v. Ivy, 93 Fla. 387, 112 So. Rep. 264.

In the case of Branford State Bank v. Howell Co., 88 Fla. 493, 102 So. R. 649, this Court said:

"The judge should never direct a verdict for one party unless the evidence is such that no view which the jury may lawfully take of it favorable to the other party can be sustained, nor should a motion for directed verdict be granted where the evidence is conflicting or will admit of different reasonable inferences, or if there is evidence tending to prove the issue. Under our jurisprudence the matter of directing a verdict as authorized by Section 2696, Revised General

Statutes of Florida, 1920, is a delicate one and should be cautiously exercised.'

"The statute referred to now constitutes Section 4363, Compiled General Laws of Florida, 1927, and that portion of said section having reference to directing verdicts provides that if, after all the evidence of the parties shall have been submitted, 'it be apparent to the judge that no sufficient evidence has been submitted' upon which the jury could legally find a verdict for one party, the judge may direct the jury to find a verdict for the opposite party."

Defendant contends that the verdict in the sum of $18,-750.00 is excessive. The record shows that in February, 1934, plaintiff was receiving the sum of $150.00 per month and was forty years of age, his life expectancy being fixed at approximately 28 years. It is shown that he is a physical wreck and has not been free of pain and suffering since the day of the injury. His injuries are permanent. It seems that the amount of the verdict is excessive. If the plaintiff remits the sum of $3,750.00 as of the date of the judgment, the judgment will be affirmed for the amount of $15,000.00, as of date thereof, otherwise the judgment will be reversed for a new trial.

WHITFIELD, TERRELL, BROWN and BUFORD, J. J., concur.

ELLIS, C. J., dissents.

ELLIS, C. J. (dissenting).—I have not made a chart of the superabundant pleadings in this case to determine specifically what issues were actually submitted to the jury. It appears, however, from the declaration that the plaintiff sued for injuries to himself resulting from two acts of negligence alleged to have been committed by the defendant: one on February 17, 1934, and the other on June 27, 1934.

The plaintiff was an employee of the Winter Park Telephone Company, and on February 17, 1934, was engaged in repairing the telephone wiring of the defendant Company;

and on June 27, 1934, was engaged as a helper in taking down an " 'FX' or 'ground' box from a telephone pole." This second injury was made the subject of the 4th, 5th, 6th, 7th, 8th and 9th counts of the declaration.

Upon the trial of the cause the jury returned a verdict for the defendant on the declaration based on the second injury, which covered all counts from the 4th to the 9th, inclusive. It is unnecessary, therefore, to review either the pleadings or the evidence as to these counts, because the verdict upon those counts being for the defendant, who is the plaintiff in error here, it has no ground for complaint upon that phase of the case.

The question, therefore, turns upon the validity of the verdict upon the 1st, 2nd and 3rd counts, which relate to the first injury alleged to have occurred on February 17th. Those counts do not state a cause of action because there is shown in those counts no causal relation between the current of electricity sent over the wires of the public service corporation upon the poles of the defendant corporation and the injury sustained by the plaintiff.

I think the demurrer to those counts should have been sustained, which being true, the verdict for the plaintiff upon those counts is not valid.

## On Petition for Rehearing.

Per Curiam.—On petition for rehearing it is contended that the Court overlooked and failed to consider the evidence adduced failed to sustain the issues. It was alleged in the first three counts of the declaration that the high voltage of electricity was permitted to run into and charge the telephone wires which plaintiff was engaged in repairing. The plaintiff testified that he was working on the telephone wire and while so doing was knocked unconscious. "The last I remember it had me gripped to it—

drawn up to it. I probably would have burned to death if I had not fallen from the pole." The evidence disclosed four ways in which the high voltage of electricity could reach the telephone wires: (a) defectively constructed appliances by placing the telephone wires in close proximity with electric wires; (b) contact of telephone wires and high voltage wires at some distance from the poles; (c) wet moss suspended from the live wire downward and contacting the telephone wire; (d) high tension wire feeding the arc within 2½ inches of the telephone wire. The plaintiff received an electric shock while on the pole and fell therefrom. It seems that these facts present a jury question. See Cameron & Barkley Co. v. Law-Engle Co., 98 Fla. 920, 124 So 814; and Florida Telephone Co., *et al.,* v. Wallace, 104 Fla. 566, 140 So. 472.

It is contended further that a question of a reasonably safe place in which to work has no bearings upon the issue here involved. This contention is without merit. See Kirkland v. City of Gainesville, 122 Fla. 765, 166 So. 460; Stearns & Culvert Lbr. Co. v. Fowler, 58 Fla. 362, 50 So. 680.

It is contended that error was committed in holding that the release and settlement signed by the plaintiff in the cause was a jury question. The evidence showed that the plaintiff was injured on the 17th day of February, 1934, and was in the hospital for some few weeks. The testimony developed the skull of the plaintiff was broken or fractured in some three or four different places; one of his limbs was broken and his nervous system impaired, and while at home on April 18, 1934, he was summoned by phone to defendant's office to confer with a representative of the Insurance Company. The record shows that Dr. McGugan testified as follows:

"Q. From an examination of that X-ray seeing the fracture of the sphenoid and parietal bones and these other bones, would you state in your opinion whether or not that would affect the brain in any way?

"A. In my opinion, the brain would be affected by the injury to the bones, and also by the force applied to produce the fracture.

"Q. How, in your opinion, would that affect the brain?

"A. Ordinarily, we find the brain bruised, the connections of the nerve cells and fibers torn apart, and usually more or less bleeding from blood vessels also torn at that time."

Plaintiff, convalescing from four skull fractures, brain bruised, the connection of the nerve cells and fibers torn apart, with more or less bleeding from ruptured blood vessels, suffering from a broken limb, and with impaired nerves, called to confer with an Insurance Adjuster conecrning his injuries. Whether or not a release signed by plaintiff under these conditions was done in a normal way is a jury question. See Florida Power & Light Co. v. Horn, 100 Fla. 1339, 131 So. 219; Douglas v. Ogle, 80 Fla. 42, 85 So. 243.

Witness A. E. Williams testified to observing plaintiff's condition shortly after the injury, viz.:

"Q. Now you say you had an opportunity to observe his mental condition; how would you describe his mental condition the best you can.

"A. In talking to him he tells you the same thing over and over, and stuff like that.

"Q. What else? Tell the best you can and as fully as you can everything you had an opportunity to observe about his mental state; whether he acted normal or abnormal, or what not?

"A. Well, I just don't think he is normal, that's all.

"Q. In what way wasn't he normal?

"A. Just the way he talks.

"Q. How did he talk?

"A. I just got through telling you. He would tell the same thing over and over and over all the time.

"Q. What did he tell you over and over?

"A. Different things about the way he got hurt before.

"Q. How many times would he tell it to you over and over?

"A. A dozen or more times a day.

"Q. Wouldn't he talk coherently about various other topics you might bring up and discuss with him?

"A. A few minutes. Then he would go right back on this.

"Q. Of telling you how this accident happened?

"A. Yes.

"Q. Would you say he talked and acted like a perfectly sane man?

"A. Yes, some.

"Q. What do you mean by that?

"A. Well, he just was off.

"Q. What do you mean by 'just off'?

"A. He just don't talk right, like anybody human to me, like he had good sense."

This testimony is corroborated by the witnesses, W. S. Robinson, J. I. Stover and James T. Buttery. The covenant not to sue is dated April 18, 1934. At the same time the release and settlement in full was signed. The record shows that he was in the office of the defendant company and the covenant not to sue. had been prepared and was awaiting his signature. Plaintiff was approached by the. secretary of the defendant, Mrs. Lewis, who placed a fountain pen in plaintiff's hand and placed the covenant not to sue

under his hand and then told him that Mr. Galloway, president of the defendant company, had said for him (plaintiff) *to sign it or else.* It is reasonable to assume that the phrase "to sign it or else" meant either to sign the covenant not to sue or plaintiff's services would no longer be needed and that he would lose his job. Plaintiff at the time was in the physical condition, *supra.*

In the case of Florida East Coast R. R. Co. v. Thompson, 93 Fla. 30, text 38-39, 111 So. 525, the question of whether or not fraud existed in the obtaining of an instrument is a question of fact to be settled by a jury, and said:

"Whether or not fraud has been shown to exist in a given case, is, as a general rule, a question of fact for the jury. 23 R. C. L. (49). But since honesty, not fraud, is presumed, neither courts nor juries may suppose the existence of fraud where the facts established by the manifest weight and probative force of the evidence may be fairly and reasonably reconciled with honesty and pure dealing. Although the positive testimony of one witness (the releasor) as to the existence of fraud, is sufficient to require the case to be submitted to the jury (Gordon v. Great A. & P. Co., 90 Atl. Rep. 78; Clayton v. Consolidated Traction Co., 54 Atl. Rep. 332), it does not necessarily follow that such testimony will be sufficient in all cases to sustain a finding of fraud. Bessey v. Minneapolis, etc., Ry. Co., 141 N. W. Rep. 244; Railroad Co. v. Shay, 82 Pac. St. Rep. 198; De-Douglas v. Union Traction Co., 48 Atl. Rep. 262; Valley v. Boston & Maine R. Co., 68 Atl. Rep. 635, and other cases hereinafter cited * * *"

The original opinion of this Court is adhered to and reaffirmed, except as to the amount of the said judgment, which from a consideration of the entire record, seems to be excessive. If the plaintiff remits the sum of $5,000.00, as of the date of the final judgment, the said judgment will

be affirmed for the amount of $13,750.00, as of the date hereof, otherwise the judgment will be reversed for a new trial.

WHITFIELD, BROWN, BUFORD and CHAPMAN, J. J., concur.

ELLIS, C. J., and TERRELL, J., dissent.