[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 256 
 STATEMENT
The following is the charge of the Court:
 "CHARGE OF THE COURT
"Gentlemen of the Jury, the defendant has filed two pleas in this case. The first is a plea of not guilty. This plea places the burden of proof upon the plaintiff to prove by a preponderance of the evidence, the allegation of the first count of the declaration. The first count of the declaration is the only count before you. The defendant has filed a second plea. This plea is what is known as a plea of contributory negligence; and alleges that the plaintiff, himself, was guilty of negligence, in that he so carelessly operated and drove his automobile that, by reason of his careless and negligent act, the plaintiff contributed to his own injury and damage complained of. Now, gentlemen of the jury, under the law, the burden of proof is upon the defendant *Page 257 
to prove the allegations of this plea by a preponderance of the evidence.
"The measure, or rule of evidence, in cases of this kind is a preponderance of the evidence; that is, the greater weight of the evidence. It is not necessarily the greater number of witnesses. In the first place, the plaintiff must show by a preponderance of the evidence, the negligence as alleged in the first count of his declaration. If he fails to do so, your verdict should be for the defendant. If he sustains such burden, your verdict should be for the plaintiff, unless you believe the defendant has proven its plea of contributory negligence of the plaintiff by a preponderance of the evidence, in which event your verdict should be for the defendant. If the plaintiff has sustained the burden cast upon him by law, as hereinbefore charged you, the burden shifts to the defendant to prove, by a preponderance of the evidence, its plea of contributory negligence. In such event, if it fails to sustain such burden, your verdict should be for the plaintiff, and you should consider the damage in accordance with the instructions given you.
"Persons driving on a public highway are entitled to assume that others using such highway will conform to the law of the road, and will use all means the law requires them to use for the safety of others; and the driver of a vehicle upon the public highway is entitled to assume that such public highway is open for public travel, and, in the absence of warning or notice to the contrary, that he can safely travel theron at a reasonable rate of speed. The driver of such automobile is to exercise the care and caution which would be exercised by an ordinarily careful and prudent person under the same circumstances.
"Upon the happening of a sudden and unexpected danger, the same responsibility does not arise as when the circumstances show that the danger may reasonably have been inferred. *Page 258 
"Where an automobile driver's vision is partially obscured by the condition of the weather, he should exercise that degree of care which an ordinarily reasonable and prudent person of reasonable prudence and caution would exercise under conditions interfering with the driver's view. It does not, however, necessarily require him to stop, but he may proceed cautiously. It is only when he is unable to see ahead of him that the law requires him to stop.
"Where one is confronted by an emergency, a sudden emergency, he is not held to the same accuracy of judgment as is required of him under ordinary circumstances. Whether or not an emergency existed, is to be taken into consideration by the jury, in determining whether the driver of an automobile has exercised reasonable care under the circumstances existing at the time of and just prior to the alleged accident and injury.
"I further charge you that a motorist who is confronted with an emergency, and who turns on the wrong side of the road, is not negligent, if a reasonably prudent man would have done so under like circumstances.
"You are instructed that the operator of an automobile is not necessarily exempt from liability for injuries to other persons occurring on a public highway by showing simply that at the time of the accident he was running at a rate of speed allowed by law. He still remains bound to anticipate that he must, in order to avoid a charge of negligence, keep a proper look-out, and keep his vehicle under such control as will enable him to avoid a collision with another automobile which is operated with reasonable care; and, if the situation requires it, he must slow up and, if necessary, stop.
"You are instructed it is necessary that the driver be able to stop within the range of his vision, or that he use due diligence to stop after discovering an object. The rule makes no allowance for delay in action. He must so drive *Page 259 
that he can and will discover an object and perform the manual act necessary to stop, and bring the car to a full stop within such range. If the driver is blinded so that he cannot see the required distance ahead, he must, within such distance from the point of blinding, bring the car under such control that he can stop immediately; and if he cannot then see, he shall stop.
"The Court charges you that if you believe from the evidence that the accident in question was unavoidable, so far as the defendant was concerned, the defendant should not be found guilty. The Court charges you that an unavoidable accident is such an accident as occurs without anybody being to blame for it, that is, without anybody being guilty of negligence in doing so, or permitting it to be done, or in omitting to do, the particular thing that causes said accident.
"Now gentlemen, right at this point, I will give you an instruction on negligencee. Negligence is the failure to do what a reasonably prudent and cautious person would have done under like circumstances; or the doing of an act which a reasonably prudent and cautious person would not have done under like circumstances. That is the best definition of negligence I can give you.
"Gentlemen of the jury, I further charge you that, if you find for the plaintiff, the measure of his damages will be such sum, not to exceed the amount claimed in the declaration, which is fifty thousand dollars, as will justly compensate him for the injury and loss shown to have been inflicted and sustained. In arriving at that compensation, you are entitled to take into consideration such bodily pain and anguish as he has suffered and will continue to suffer by reason of such bodily injury; and the loss of time, and incapacity to follow his usual occupation, which he has and will sustain on account of such injury; any sums *Page 260 
necessarily and reasonably expended or incurred by him for the services of a physician or surgeon in and about seeking his cure, and any sums necessarily and reasonably expended for hospital expenses, medicines, and braces for his body as a result of such injury; any loss sustained by the plaintiff as a result of the injury and damage to his automobile, if you find that the automobile was damaged as alleged in the declaration; the health and physical condition of the plaintiff and the effect of the injury on him; his age, sex, condition, and circumstances in life; and his earning capacity at the time of the injury and afterward. In case you find that the plaintiff has been permanently injured or disabled, you may award to him such sum as will compensate him for such permanent injury. You can consider his probable future earnings from the present time to the end of his life expectancy; his earning capacity at the time of the injury, and the extent to which that capacity has been reduced by the injury; and the amount that you find as future or prospective damages must be reduced to its present value, and such present value awarded by your verdict."
The injury complained of occurred on a State highway, on a stormy night.
The following portions of the testimony adduced at the trial are pertinent to the matters discussed.
Plaintiff testified:
"* * *the storm had reached its height and probably subsided a little. A terrific wind was blowing. I think the records indicate a high wind. I have traveled that highway for more than fifteen years, myself, and I have had other experiences in this particular situation, because the trees being so old, the wind invariably pulls some large limbs out of those trees, and it obstructs the highway. The limbs have a tendency to fall and as I approached the highway, the lightning was striking, but there wasn't sufficient *Page 261 
light of any kind; but as I entered what is known as Lover's Lane, my lights flashed on a fallen tree. It was very easy to discern the tree. My lights were bright, and I saw it, and when I saw it, I began to slow up. I pulled up then within twenty to twenty-five feet of the tree, very likely; I don't know exactly, because it all happened so rapidly. That is where those trees form a line. That street runs perfectly regular on up through there. As I saw the tree, I slowed up within twenty or thirty feet. Just as I pulled to a dead still position, I noticed the bus lights flashing on the other side of that. I could see that through the tree top. I hesitated just a moment. I saw the lights of the bus approaching. I was on the right side of the road and entirely off the pavement, with my two right wheels. Coming along the road I was absolutely on the extreme right. I saw that a tree had fallen from the left side of the highway across the highway at an angle — that is, the left hand side of the highway as I was traveling. In other words, it had fallen toward the south side of the road. It appeared to be a tremendous tree. I got up in close proximity with the shape of the tree. I came to a stop, with the idea of investigating the possibility of getting through. But just as I came to the stop, I sighted the bus coming in the opposite direction. I hesitated a moment to see whether or not the bus was going to stop, because of the fact I anticipated being unable to, and the lights of a sudden headed over on my side of the road; it seemed to make a sharp turn to the left, or headed directly into me. I saw the bus coming and attempted to get out of the way; put my car in reverse and shot the gas to it, to come back as fast as possible. At that moment, the bus struck the tree, and, evidently unable to stop, hit the tree; and immediately I saw these limbs fly and then the lights come up in my face. I attempted to get out of the car. I released the latch or handle *Page 262 
of the door as the lights approached me, into my face; and I leaned, as I released the latch of the door, and that was the way I remember, and the bus crashed into the car. I was on my right hand side of the road when the bus struck my car. I was partly off the pavement on my side of the road, the right side. The bus was on my side of the road when it was struck, and it was right in my face on the right side of the road. He hit me on his left side of the road. I was on my extreme right. When this bus approached there, it was coming in the opposite direction from which I had been traveling. It was coming from towards Jacksonville. I was coming into Jacksonville. The bus was the Union Bus Company's bus."
The bus driver testified:
"On or about July 21, 1934, I was driving a bus on the state road, between, somewhere between Lake City and Live Oak, at which time my bus collided with a car of Mr. Bowen, the plaintiff here. I remember when the collision happened. It happened around and in the center of Lover's Lane, on the left hand side of my road, somewhere between or about the tree tops. This collision occurred around nine-five or nine-ten at night. Prior to the collision it had been raining, the wind had been blowing, and there was a vivid, there were vivid bright flashes of lightning. At times those vivid flashes of lightning were so bright that after the flash you were momentarily blinded. The tops of those trees on this Lover's Lane overhang into each other. The pavement at that place is Macadam road, and at spots it is covered with black asphalt pavement. When it rains on it, the pavement is dark, very dark. Immediately before this accident, it was drizzling. It had been raining, but had stopped several miles before the scene of the accident. * * * That bus will go not over 35 miles an hour on a level road in third gear. I had occasion to apply *Page 263 
my brakes that night immediately before this collision. My bus was being driven at between thirty and thirty-five miles an hour immediately before I started to apply the brakes. After I topped this last hill with reference to the scene of the collision, I ran in second gear approximately one hundred or one hundred and fifty feet, to get my speed out of second gear. I couldn't have been over a quarter of a mile east of the scene of the accident when I shifted into third; approximately five or six hundred feet. My bus was going around twenty at the time I changed from second to third gear. After I changed into third gear, I had gone about four or five hundred feet before my bus attained a speed of thirty or thirty-five miles an hour. I had gotten to the edges of the trees. I left Lake City that night at eight forty-five. It is approximately nine or ten miles from Lake City to the scene of the accident. You ask what caused me to apply my brakes at that time immediately before this collision; I was on my right side of the road, and I saw an object in front, directly in front of me. At first, I could not tell whether it was shadow or whether it was a tree. I had started slowing down at the first impulse of what I had, what in my mind was the shadow or the object. And as I got nearer, I saw that it was the trunk of a tree lying directly to my right. There was no branches sticking out from that trunk of the tree on the right side of the road. They were sticking out on the left side of the road. Realizing that if I hit the trunk of the tree, and my passengers are always first, and knowing that what might result, in a quick glance, I figured it would be the safest, whether to hit the trunk of the tree, or go through the branches, and I taken the branches of the tree, realizing I had a chance to go through the branches. I had thirteen passengers on the bus that night, male and female passengers. Then the bus ran into those branches *Page 264 
on the left side of the road. The branch that struck my bus broke to the right of the windshield, was laid completely across the windshield, covered with limbs and leaves, obstructed my vision, and I could not see where I was going. My brakes were still on. As I stripped this tree, got into the branches, I could feel the bus was still in motion, and I felt a slight impact to the front of the bus; and thinking that I had cut too far over to the left side of the road, and the left side of my bus had struck a tree, I cut back to the right; got out of the bus — and then I stopped. I got out of my bus, and the first thing, to my surprise, I saw that I had collided with an automobile. There were not any lights visible from the opposite direction until after I had gone through the branches of the tree and come to a complete stop. The first lights I saw coming from the opposite direction were after the accident and I had gotten out of the car, other approaching automobiles. My brakes were in fair running condition that night. My lights were in good working order, and lighted. Both of my bright headlights were on, and I had one road light. * * * From the time I first started applying my brakes until I hit the tree, my bus had been reduced to a very, very slow rate of speed. I could tell in the bus that the bus was still moving, but I could not make any distance at all, because I was blinded, I didn't know where I was. All I knew, that the bus was moving, when I felt a slight impact. Immediately preceding my seeing this object in the road, there had been vivid flashes of lightning. On the way from Baldwin there had been lightning that night, of not the bright sort at that particular time, because it hadn't quite got dark; but from Baldwin into Lake City, there were vivid flashes of lightning. And when we left Lake City, there were even worse. There was lightning flashes just, they were so bright that it was all the same as when you look out and see one of these electric *Page 265 
arcs in the car tracks, the same blindness that you get when you see that. When I got out of my bus after this collision, I was on the left side of the road; directly in front of Mr. Bowen's car, the car I had collided with, locked up into the bumper of the bus. To the right of the right fender of the bus, Mr. Bowen's body, but at that time I did not know it was Mr. Bowen, laid to the right of his fender, about ten feet away from the car on the right side of the road, on my right side of the road. The door of his car was open, the left door of his automobile was open; that is the door beside the driver's seat. When I had gotten out of the bus and saw Mr. Bowen lying in the highway, I immediately went to his aid. I picked Mr. Bowen up and had him resting in my right arm, bent down, with my right leg, and he was resting on my right leg and arm. I asked Mr. Bowen was he injured, and I could not — he didn't seem to answer me clearly. * * * I saw his trunk of the tree, when I was about fifty or seventy-five feet off. I applied my brakes then, right then, when I first saw the trunk of that tree. I couldn't tell at first, when I saw it, whether it was an object or a shadow. In doubt about the shadow, I applied the brakes. I didn't cut over to the left then. I proceeded right on towards this object, and as I got nearer to it, I saw, and made up my mind it was the branches, and it was the tree trunk. I was the distance from here to the wall when I first saw the object. The first thing you see when you are driving, the first thing you see is not the actual object, but just lots of times, I have been driving, sir, and a lot of time, I have stopped and slowed down and found there was nothing. I saw an object and applied my brakes. Just a few seconds, and I realized it was a tree trunk, and realizing I could not stop, I turned to the left of the tree to go through the branches. After seeing the object, I proceeded just a matter of a few feet, not thirty *Page 266 
or forty feet closer. I made a statement to the insurance company or someone on the night of the accident and made out the papers on it. I recall what I stated in that statement. I was going between thirty and thirty-five miles an hour when I first saw that object and applied my brakes. I couldn't say I was going 31 miles because I did not have a speedometer, and I was not looking at a speedometer. I could have been going thirty-five miles an hour. I won't say that I was not, or that I was. I made out in my report that I had seen this tree seventy-five feet away, approximately seventy-five feet away. I made a written statement and I signed it. Realizing that it was a tree trunk, I cut to the left. As I cut to the left of the road, there was a passenger sitting on the right front seat of the bus started head first through the windshield. I reached up and grabbed this passenger with my arms, and held on to him, and guided that bus through the tree tops, holding on to this passenger to keep him from going through the windshield."
A physician testified:
"I am a physician. I know Mr. Bowen, the plaintiff in this case. I have known him since July 23, 1934. I became acquainted with him when I saw him in St. Luke's Hospital on that date at 3:30 P.M. He had been wounded at that time. I am still treating him. He was brought in to St. Lukes Hospital on July 23, 1934, where he was seen; and the examination revealed a long lacerated wound on the back of his head, about three inches in length; a lacerated wound of his right ear; and many brush burns over the back and shoulders and sacrum, that is, the lower part of the back and legs. There was a tenderness over the shoulders, chest, and the lower part of the back. On the X-ray he was found to have a fracture of the twelfth rib on the left side, with some dislocation and a fracture of the lamina *Page 267 
of the fifth lumbar vetebra on the left side; that is, the last joint of the spinal column, the twelfth rib being the last rib on the way downward. He still has an injury there. He was kept in bed; and on the third day of August a plaster jacket was applied; and on the fifth he was sent home. He wore this jacket for about one and a half months continuously, at the expiration of which time the cast was split, and he was allowed to sleep without it at night, but wear it in the daytime. That is up to January, 1935. Following this he wore a belt, a leather belt. And then I gave him all sorts of, an injectment treatment in the caudal canal, that is the canal of the sacrum, or the pelvis bone, and injections in the veins, and medicines by mouth; and also had a tooth extracted. (Examining cast.) This looks like the cast he wore. He wore it by my prescription up until sometime in January, 1935. Since then, by my instructions, he has been wearing a belt. That is the treatment I told him to follow right on — well, I know that he was seen by Dr. Fort, who prescribed a little different type of belt that he has been wearing in the last few months. I am convinced that he has pain, because on the examination I gave him on Monday of this week, the 25th, on inspection of the spine, he still has muscular spasm over the site of the fracture. I am not able to tell how long that will last. It may last indefinitely."
A witness for the plaintiff testified that she and her husband lived a hundred feet from the center of the highway; that "I did not see the impact. When I heard this impact, I ran right out the front door and down through the lane. When I got there, I saw that the bus had come through the top of the tree, on the left hand side of the road, and had struck this car that had backed back approximately forty feet from the tree on the left hand side of the road, because they had done proceeded towards Lake City. But *Page 268 
the bus was on the left hand side of the road also, and had struck this car. * * * The driver of the car that was struck by the bus came down the highway and stopped some little distance from the tree. I saw him stop. And then I turned to go back in the house and I heard his car go in reverse. Well, he had backed a minute or two, you see, I don't know just how long, but approximately the position of the car was between thirty and forty-five feet from the top of the tree where the bus struck.
 "CROSS-EXAMINATION
"* * * I saw the bus coming. You want me to estimate how many minutes it was from the time Mr. Bowen's car stopped on the road that night until he put it in reverse? He didn't stop and put it in reverse and go right back that very second. It was a time from the time I was standing on my steps and that he stopped until I got into my living room and heard him reverse. * * * Mr. Bowen's car had backed up about twenty-five to forty feet; I don't know exactly what. I heard him put it in reverse. The car was a little more than forty-five feet from the fallen tree when I got there, but the bus had struck the car, I presume it had struck it, because the bumper was up on that car. When I got out there, the bumper was right up against the front of his car."
Passengers on the bus who were witnesses for the defendant testified:
"I felt the brakes applied, and almost immediately there was a crash, and some glass was flying through the bus. And then, immediately following that, we had the collision. I could not see in front of the bus. I had opened my eyes, of course, when the brakes were applied, but I could not see in front of the bus what was going on, or what was out there. Immediately after the collision, the glass was *Page 269 
flying, and I got up and was asking the passengers on there if any of them were hurt. And I was probably in the bus for two or three minutes, making inquiries like that, and then I went out and got out of the bus. Immediately after the brakes were applied, I felt the bus swerve to the left. That was after the first crash, though, and we had run into the lap of the first tree, then I felt the bus swerve to the left. Then followed the crash. We struck the tree lap before I felt the bus swerve. As a matter of fact, it knocked a very large limb off of that tree, and that limb hung on the hood of the bus. That is when it first struck. I got in the seat, the driver's seat, later to see, after the crash, and look out, and that limb there, the leaves on it, obstructed my vision, and you could not see anything at all. I do not know where that limb came from. I presume it was knocked from the first tree. There were two trees, and I presume it was knocked from the first tree. The first tree was on the right hand side of the road as the bus was going. I do not know whether that branch of the tree broke and fell off of the tree on the bus. Immediately prior to this accident, we were having a very heavy electrical storm."
"I felt the brakes being applied to this bus that night immediately before the collision. I was sitting straight up at the time, looking to the front of the bus. When I felt the brakes applied, I really think that I must have seen the tree, or that is the branches of this first tree he run through just at the time he did, because just the second I seemed to have seen it, why, he applied the brakes; and he ran through this underbrush of this first tree, and this limb hung on the hood of the bus. Then is when he swerved to the left, and I am very thankful to say that he did that. When he swerved he went under it, apparently, because that is all that saved us." *Page 270 
This writ of error was taken to a judgment awarding damages for personal injuries to plaintiff and damage to his automobile in a collision with a passenger bus on the public highway about nine o'clock at night, it being stormy and dark.
The declaration charged negligence in operating the bus which proximately caused the injuries. Trial was had on pleas of not guilty and contributory negligence. Verdict and judgment awarded plaintiff $10,000.00 damages, the personal injuries being very serious and painful.
The evidence sustains a finding in returning a verdict for the plaintiff, that as a severe wind storm with rain was receding, the bus containing passengers was going west at a speed of thirty or thirty-five miles per hour; that the driver, when about fifty or seventy-five feet from it, saw an obstruction which was a large tree lying across the road, the top branches of the tree being on the south side of the road; that the driver did not stop the bus as he approached the obstacle in the road, but turned to the left side of the road, and continuing to travel, passed through the branches of the tree, breaking some of them, one clinging to the front of the bus; that after passing through the bushy top of the tree on the left hand side of the road, the bus collided head on with an automobile, which, going east, had approached the obstruction, and the driver of the car, seeing the head lights of the bus coming towards him, was in the act of backing away from the obstruction when the collision occurred; that the driver of the car, plaintiff here, was seriously injured and the car greatly damaged. (See quotation from the testimony as set out in the statement filed herewith.)
In rendering the verdict, the jury was justified in finding from the evidence that the circumstances of storm and darkness required of the bus driver the exercise of due and *Page 271 
reasonable care as to speed of travel and caution which the law makes it a duty to exercise under such conditions of storm and darkness when carrying passengers on a public highway which others had a right also to use in going in opposite directions; that the speed of the bus should have been so regulated that when the driver of the bus saw the ominous obstruction in the road when the bus was about fifty or seventy-five feet from it, his duty was to have been traveling at a safe speed and to have at once gotten the bus under control to stop quickly if necessary or proper to avoid danger; and that whether he saw the lights of the approaching car through the branches of the tree on the road or not, under the unusual and obvious circumstances attending the storm and darkness, it was negligence to have attempted to pass on the left or south side of the road through the top branches of the tree lying across the road, without taking the reasonable precaution of a prudent and careful man as required by the law to ascertain whether it could be done without endangering the safety of the passengers in the bus, and without injuring any one lawfully on the the left side of the road or approaching from the opposite direction. The lights of the bus were shining on the plaintiff in his car as the bus passed through the top branches of the tree and then, proceeding on the left side of the road, collided with plaintiff's car. The branches of the tree top that lodged against the windshield of the bus as it passed through the tree top on the left side of the road, obscured or interfered with front vision from the driver's seat, which should have prompted the driver to stop the bus without delay to avoid further dangers.
The transcript of the record shows that the defendant requested seven distinct and separate charges, "but the court refused to give said charges as requested, and noted exception for the defendant." This is not an exception to *Page 272 
each of such refused charges; but as some of them are made separate assignments of error, and they have been argued by counsel for both parties, the refused charges so assigned as error will be considered with the questions presented for decision. Such refused charges assigned as error are as follows:
"3. The Court charges you that a person driving on a public highway has a right to presume and to act upon the presumption that the way is safe for ordinary travel even at night, and he is not required to be on the lookout for extraordinary dangers or obstructions to which his attention has not been called.
"4. The general rule that it is the duty of the driver of an automobile to maintain a speed sufficiently slow and to have such control of his car that he can stop within the distance in which he can plainly see an obstruction or danger ahead does not apply to a case where a dangerous situation which the driver of the automobile had no reason to expect suddenly appeared in front of the car.
"5. This Court charges you that it is unlawful under the Statutes of this State to stop any motor vehicle on the public roads for either convenience or repair, but in all cases, where possible to do so, shall turn off the road to the right, and the left wheel nearest the center of the paving shall not be more than one foot on the side of the paving; if therefore you find that the plaintiff violated this law and that such violation contributed to the injury complained of, it is then your duty to find for the defendant. * * *
"7. The Court charges you that the party who last has a clear opportunity of avoiding an accident, notwithstanding the negligence of his opponent, is considered solely responsible for it. `The last clear chance doctrine' operates in favor of the defendant if the plaintiff should have discovered *Page 273 
the defendant's negligence, if you find the defendant was negligent, in time to avoid its consequences and fails to do so. If you find from the evidence in this case that the plaintiff, M.I. Bowen, saw or could have seen by the exercise of reasonable care under the circumstances that the collision was about to occur and that the plaintiff, M.I. Bowen, by the exercise of reasonable care under the circumstances in which he was placed could have avoided the injury, and that the plaintiff, M.I. Bowen, did fail to exercise reasonable care under those circumstances to avoid the collision, you are then warranted in finding that the plaintiff, M.I. Bowen, had the last clear chance of avoiding the accident, notwithstanding the negligence, if any, of the defendant. If then you find that the plaintiff, M.I. Bowen, did have such a last clear chance, it is your duty to find for the defendant."
Requested charge No. 3 was properly refused because the conditions arising or resulting from the impending storm that were obvious or that reasonably should have been anticipated, viz.: the falling of nearby trees on the road to obstruct the road and endanger passengers in transit and the approach of vehicles from the opposite direction, required in reason more than the usual or customary care. The charges given by the court covered the substance of the requested charge and were appropriate to the evidence adduced.
Requested charge No. 4 was effectively covered by the charges given, which were entirely fair under the evidence. See paragraphs 3, 4, 5, 6 and 7 of the charges given which appear in the statement.
Requested charge No. 5 has no proper basis in the evidence, since there is no showing that plaintiff stopped his car on the road for convenience or repair; but the evidence shows the plaintiff was on his, the south, side of the road, *Page 274 
had just arrived at the obstruction, and was endeavoring to back away from the bus which was approaching through the tree top from the east on the south side of the road when the collision occurred. The evidence does not show that the driver of the bus was justified in passing through the tree top and proceeding east on the left side of the road. The evidence shows that the driver reasonably could and should have stopped the bus before it struck plaintiff's car, after he saw the obstruction fifty or seventy-five feet before reaching it, and before the bus had passed through the tree top and beyond on the left side of the road going west.
Requested charge No. 7 was not applicable to the evidence, since the last clear chance doctrine cannot be applied against the plaintiff in this case when the evidence shows the plaintiff had a right to be on the road, had stopped at the obstruction, and was endeavoring to back his car to avoid a collision that was caused by the negligence of the bus driver in passing through the tree top on the wrong side of the road when he had first seen an obstruction in the road fifty or seventy-five feet from it and reasonably should have stopped the bus before it crossed to the left side of the road and passed through the tree branches on the left side of the road, and continued forward until the collision with plaintiff's car which the evidence shows must have been more than twenty feet west of the tree obstruction of the road and on the south side of the road. There was no evidence of negligence of the plaintiff. Davies v. Mann, 10 M. W. 546, 152 Reprint 588, 19 E.R.C. 190; 11 C.J. 281 and notes.
The sixth and seventh assignments of error are:
The Court erred "6. In its charge to the jury in the matter of damages to the plaintiff in giving the following charge: `In arriving at that compensation, you are entitled to take into consideration such bodily pain and anguish as he *Page 275 
has suffered and will continue to suffer by reason of such bodily injury; and the loss of time, and incapacity to follow his usual occupation which he has and will sustain on account of such injury; * * *" In giving this charge, the Court failed to charge the jury to limit such compensation to the future pain and suffering and loss of earning capacity `* * * as the evidence
shows the party is reasonably certain to endure as a result of the injury.'
"7. In charging the jury as follows: `He must so drive that he can and will discover an object and perform the manual acts necessary to stop, and bring the car to a full stop within such range.' The Court erred in giving such charge in failing to make an exception in the case of a sudden and unforeseen emergency or obstruction of the road which would not be and was not reasonably apprehended by the driver on such road."
The last quoted charge is not error considering other charges given and the evidence.
The charges were legally sufficient to advise the jury that the verdict must be formed from the evidence adduced, and that conjectural damages should not be allowed; and if the defendant desired more specific or elaborate charges in the premises, it could have requested that they be submitted. No such requests appear to have been made.
The charge of the court sufficiently indicated to the jury that their verdict must be predicated upon the evidence adduced; and the expert and other testimony in the record clearly shows that the serious injuries to plaintiff had caused great and long continued pain and suffering which would very probably continue, though not so severe as in the past. The nature of the injuries and their natural consequences, as shown by the evidence, would naturally cause a loss of activity and most probably loss of earning capacity *Page 276 
as well as physical pain for a long period of time. This is shown by the record, and there is nothing to indicate that the verdict for the plaintiff or the amount thereof was arrived at by conjecture or speculation, or by anything outside the evidence. The damage to the automobile was considerable. It cannot fairly be said on this record that the amount of the judgment is excessive or that it was improperly arrived at by the jury. See Winter Park Tel. Co. v. Strong, 130 Fla. 755, 179 So. 289.
The judgment is affirmed.
ELLIS, C.J., and WHITFIELD, TERRELL, BROWN, BUFORD and CHAPMAN, J.J., concur.