268 So.2d 416 (1972)
Angel ACOSTA, a Minor, by and through His Mother and Next Friend, Gloria Acosta, and Gloria Acosta, Individually, Appellants,
v.
Frank Logan DAUGHTRY and Larry Daughtry, Appellees.
No. 71-786.
District Court of Appeal of Florida, Third District.
September 19, 1972.
Rehearing Denied November 28, 1972.
*417 Horton, Schwartz & Perse, Dunn & Johnson, Miami, for appellants.
Carey, Dwyer, Austin, Cole & Selwood, and Steven R. Berger, Miami, for appellees.
Before PEARSON and CHARLES CARROLL, JJ., and HOWELL, CHARLES COOK, Jr., Associate Judge.
CHARLES COOK HOWELL, Jr., Associate Judge.
In this case, brought by Angel Acosta, a minor, by and through his mother and next friend, Gloria Acosta, and Gloria Acosta, individually, against his almost equally youthful friend, Larry Daughtry, and the latter's father, Frank Logan Daughtry, to recover for personal injuries sustained by Angel Acosta when a revolver in the hands of Larry Daughtry discharged, the bullet striking Angel in the right chest, we hold, following a jury verdict and judgment for the defendants below, and a consequent appeal *418 here by the plaintiffs, that, under the peculiar facts now to be related,
1. There was no submissible evidence of contributory negligence to go to the jury;
2. Assuming, arguendo, that there was, Larry Daughtry's acts were so flagrantly negligent or willful or wanton in nature as to deprive defendants of a contributory negligence defense;
3. A fortiori, assumption of risk was inapplicable;
4. Plaintiffs' motion for a directed verdict on the issue of liability should therefore have been granted as to defendant Larry Daughtry; but
5. It was entirely proper to grant defendant Frank Logan Daughtry's motion for a directed verdict at the close of the plaintiffs' case[1].

Basic Facts
Between 5:00 and 6:00 o'clock P.M. on the early winter afternoon of December 6, 1968, Angel Acosta, age 16, was in a room in the home of Larry Daughtry, age 20. Both youths were well acquainted with many makes of firearms, including handguns. They were quite familiar with their mechanical operation and experienced in their use. Construing (as we shall, throughout, save on the issue of the father's exculpation) the evidence most favorably to the defendants, Frank Logan Daughtry, Larry's father, had entrusted the .38 caliber, 5 shot revolver in question to his son to see if Larry could restore it to completely efficient working order. Angel was not averse to, as a matter of fact did, assist in these endeavors. It seems that "you couldn't cock it all the way so you couldn't pull the trigger ... . . You couldn't cock it. It wouldn't cock. It would jam up." Accordingly Angel removed the gun from its repository drawer and extracted, in Larry's presence, all 5 cartridges from the cylinder. He "strapped it on his hip, trying it on"; although never, at no time, was there any horseplay by either boy with the gun. While Larry was briefly in an adjoining room preparing to take a shower, Angel "pulled the hammer and released the trigger... ... it worked properly ... ... 3 times." Still, Angel had his misgivings. He "thought something was wrong with the back plate". During the brief interval Larry was absent from the room Angel reloaded the weapon. He did not tell young Daughtry, when Daughtry reentered the room, that he had done this. He did say, however, "I told him I didn't fix it."
So what did Larry Daughtry do?
He picked up the gun and, while it was pointing directly at Acosta, pulled the trigger.
Acosta, feeling "like a big electric shock" called upon his Maker, and Larry Daughtry "comes over to me and eases me to the floor ... ... I was coughing up, you know, to my throat the blood, you know."

No Contributory Evidence
It is difficult to gather from this entire record enough evidence to say that six reasonable men and women of a jury could yet find that Angel Acosta was *419 guilty of negligence contributing to the foregoing catastrophe.
It is true that on page 123 of the transcript of the trial proceedings Acosta concedes that he was "well aware of the dangers of guns and how to handle them and how you should always advise people whether they are loaded or unloaded." Granted. It is also true that Daughtry had not witnessed the reloading of the weapon and thought, therefore, that it was still empty. True, again, that Acosta did not explicitly inform Daughtry on the point.
But wherein a proximate cause of Acosta's injury that Acosta did not convey this warning to Daughtry, himself wise in the ways of handguns; himself perfectly aware that Acosta had not told him, one way or the other, "whether (this particular pistol was) loaded or unloaded"; and himself choosing to act quite independently of Acosta?
And what of the doctrine of foreseeability; as essential an ingredient of contributory negligence as of negligence? These boys had carefully abstained from flippant and indifferent treatment of the gun before its ultimate and unfortunate discharge. Daughtry had not even pointed it at Acosta before this took place; much less cocked the hammer and pulled the trigger while such a hypothetical pointing was taking place. Should Acosta have realized that if he did not specifically tell Daughtry the five bullets had been put back into the cylinder, Daughtry would not only point the gun directly at Acosta, but, what is more awful, would cock its hammer and pull the trigger while the muzzle was aimed at his friend?[2]
In short, the position of Acosta falls squarely within the protective aegis of this Court's philosophy in Shapiro v. F.W. Woolworth, Fla.App. 3, 1960, 120 So.2d 806, 807: "The pleadings and deposition do not suggest that the plaintiff should have suspected the existence of a dangerous condition, and in the absence of such showing, it would not necessarily constitute contributory negligence to fail to look out for danger when there was no reason to apprehend any". The Supreme Court itself, in Southern Express Co. v. Williamson, 66 Fla. 286, 63 So. 433, 437, 1913, said without qualification that "it is not contributory negligence to fail to look out for danger when there is no reason to apprehend any." (Emphasis, throughout, supplied.) Add to the foregoing the circumstance that in Acosta's particular situation "the question is whether one should be aware of the danger. This depends largely upon the likelihood of encountering danger ... One need not look for danger unless there is reason to expect it." Maas Bros., Inc. v. Bishop et al., Fla.App. 2, 1967, 204 So.2d 16, 20. The trenchant phraseology of Beikirch et vir. v. City of Jacksonville Beach, Fla.App. 1, 1964, 159 So.2d 898, 902, is: "Apart from the application of these three rules, another well-recognized doctrine alone precludes the entry of a summary judgment on the ground of contributory negligence  the doctrine that the knowledge of an injured party concerning the condition that gave rise to his injury does not bar his recovery in a negligence action unless he had knowledge that the condition was dangerous  that is, that it posed a danger to him. See, for instance, Bartholf v. Baker, Fla., 71 So.2d 480 (1954), in which the Supreme Court of Florida held that `appreciation of the danger' is essential to the defense of contributory negligence, `as is knowledge of the condition which creates the peril.'"
*420 Then too: Added to the unreasonableness of requiring Acosta to foresee the strange actions of his friend was the freezing, paralyzing, effect of the shortness of time available to him to fully comprehend what was about to take place and remove himself out of the line of fire or shout a prohibitory warning to Daughtry. Only one shot was fired. Recalls Acosta, "I was reading the newspaper in the corner of the room and he pulled the hammer and it must have slipped or something because he caught me in the chest."

Contributory Negligence Unavailable in the Face of Willful Negligence
But let's assume that somewhere, under some construction, in the light of a possible but presently undisclosed argument, there lurks a legitimate shadow of contributory negligence over the plaintiff's case and conduct. Would it be available to the Daughtrys in the case sub judice, after the manner in which Daughtry the son caused this injury?
As already once observed, he did not himself, before firing it, examine the revolver to see if perchance it were reloaded. He did not himself ask Angel Acosta if Angel had put the bullets back in before handing the gun to Larry Daughtry. He obviously did not look to see where the revolver was pointing before he discharged it; or, looking, did not easily turn the muzzle from Acosta's chest before pulling the trigger. He did not himself cry out to Angel some such suggestion as, "Watch yourself! I'm going to test this!"[3]
No.
"Q. What did you do?
"A. I was looking at the gun prior to the accident; I had it pointed up in the air like this (indicating) and I brought it across the front of him and I cocked it and fired it. That's when it discharged... ... I had it up in the air and I brought it in front of Angel and cocked it and pulled the trigger!" (77-78, 89)
As far as we have been able to ascertain our Supreme Court has never departed from the ruling initially laid down so long ago (1892) in Florida So. Ry. Co. v. Hirst, 30 Fla. 1, 11 So. 506, 513: "... we have not lost sight of the fact that when the defendant has inflicted the injury intentionally, or when he has done so unintentionally, yet his conduct, though still within the domain of negligence, has been wanton or reckless of its injurious consequences, or, in other words, he has been guilty of what is now called, it may be inaptly, `willful negligence', the contributory negligence of the plaintiff is not a defense." Much more modernly the Supreme Court, in Deane v. Johnston, Fla., 1958, 104 So.2d 3, 9, has re-affirmed "that contributory negligence commonly does not bar recovery for harm caused by defendant's reckless disregard for the plaintiff's safety, unless the plaintiff is similarly reckless ... ... This reckless or wanton disregard may result in the elimination of contributory negligence as an issue in the case, but it is not classified as an intentional wrong." In Johnson et al. v. Rinesmith et al., Fla.App. 2, 1970, 238 So.2d 659, *421 660, the principle was again saluted in an automobile case where, for aught that appears from the opinion, the only evidence of "willful and wanton misconduct on the defendant's part" was the fact "that Bolt was drunk at the time!"
This was no toy so boldly being wielded by Daughtry the Younger.
Lay literature speaks of happenings "as sure as a gun." The Spanish Friar, by John Dryden, Act III, Sc. 2. Wilfred Owen, in his Dulce et Decorum Est, notes the "monstrous anger of the guns." On the suddenly unleashed wrath of this one Larry Daughtry has without doubt many times bitterly philosophized in pondering the "broken friendships round its inner wall  Which once my careless hand let slip and fall ..." Arthur Upson, Chapter XXV, Octaves in an Oxford Garden.
Legal literature in our own State of Florida resounds in recognition of the "settled law in many jurisdictions that the highest degree of care is exacted of those handling firearms. They are classified as dangerous instrumentalities and the highest degree of care is exacted so as to prevent injuries to others. The highest degree of care is necessary in the manipulation or use of firearms in the presence of or in the vicinity of others so as to avoid injuries to others, and if injury results from the negligent discharge of firearms used or handled by another, although the discharge thereof is accidental in the sense that it was not intentional, the law makes the person causing the injury liable." Skinner v. Ochiltree, n. 3 ante; at 5 So.2d 606. Other jurisdictions are in accord. While Lowe v. Department of Motor Vehicles, 244 N.C. 353, 93 S.E.2d 448, 453, 454, 1956, was dealing with "actionable, not culpable negligence," nonetheless, and most significantly, the General Assembly of North Carolina had thought it prudent to go so far as to enact a statute, G.S. Sec. 14-34, declaring, in essence, that "if any person intentionally points a pistol at any person, this action ... constitutes an assault"; and the North Carolina court held its Department of Motor Vehicles liable in damages to a plaintiff struck in the neck by a bullet discharged from a State Highway Patrolman's drawn gun when the officer tripped over an obstacle in the path he was taking in running toward the plaintiff's car. Hacker v. City of New York et al., 1965, 46 Misc.2d 1003, 261 N.Y.S.2d 751, 753, went for another plaintiff injured by a patrolman's gun which discharged while being returned to its holster: "The cleaning of a revolver in an apartment with people present is in total disregard of the basic standards of safety. It is in direct contravention of even the initial basic precepts set forth in the course of instruction given to all recruits by the Police Department". And, in quoting from an earlier decision of its own Court of Appeals in Palsgraf v. Long Island R.R. Co., 248 N.Y. 339, 344, 162 N.E. 99, 100, Hacker reiterated (261 N.Y.S.2d p. 754) that "`Some acts, such as shooting, are so imminently dangerous to any one who may come within reach of the missile however unexpectedly, as to impose a duty of prevision not far from that of an insurer.'" Walker v. McClanahan, Ariz. App. 1, 1972, 494 P.2d 725, 727, applies the res ipsa loquitur rule to a case like this. The view of Clark v. Braham et al., 386 Mich. 53, 191 N.W.2d 352, 354, 1971, is that the "doctrine (of contributory negligence) has no application in cases of injury caused by heedless shooting"; and "reversed and remanded" the defendants' judgment obtained in a non-jury trial "for determination of damages"  regarding a failure by the defendant to make proper observation as tantamount to willful and wanton negligence.
Daughtry mistakenly assumed that the revolver in his hand was unloaded. He should have realized how often it is that fatalities are inflicted by "unloaded guns." It was especially imprudent of him to take any comfort from Acosta's assertion that the gun had not been "fixed"[4] because he, *422 Daughtry, knew that "it would fire most times properly." Well-nigh a matter of precautionary general knowledge on the part of one of far less gunnery expertise than that possessed by Daughtry is the subject matter of the Field Manual prepared by Headquarters, Department of the Army, Pistols and Revolvers, FM23-35, issued September, 1971; where, at page 55, paragraph 69, fundamental "General Safety Precautions" are plainly stated, even to those whose profession is the deadly art of killing:
"(2) Weapons, including the CO2 powered pistol, must be handled carefully and will never be pointed at anyone except the enemy in actual combat.
"(3) Always assume that a weapon is loaded until it has been thoroughly examined and found to contain no ammunition."

No Assumption of Risk
Probably this is obvious from, and without much added comment to, our consideration of the topic of contributory negligence.
Simply remember, please, this Court's language in Brady v. Kane, Fla. App. 3, 1959, 111 So.2d 472, 473, 474; where the holding was that "at the least" the question was one for the jury whether a golfer had assumed the risk of being struck by a moving club; an instrumentality much less noxious and lethal than a .38 caliber revolver. While it is conceded that the plaintiff had warned the defendant "about swinging his club", Larry Daughtry should have required no warning whatsoever not to ever point a revolver at another and pull the trigger without assuring himself that the gun was unloaded, or at least without inquiring on that score from the very man who had recently been working upon it. And although the golfer, in Brady, "was standing somewhat to the rear of" the defendant, "and facing in the direction of the hole to be played", and although it is certainly arguable that such golfer should have realized that the defendant "had taken practice swings on other tees before the ninth", upon which the golfer was struck, this Court nonetheless declared that "`voluntary exposure is the bedrock upon which the doctrine of assumed risk rests. Appreciation of the danger is an essential to the defense of assumption of risk ...' Bartholf v. Baker, Fla., 1954, 71 So.2d 480, 483. A member of a golfing foursome assumes certain obvious and ordinary risks of the sport by participating therein with knowledge of its normal dangers, but a player does not assume a risk which cannot reasonably be anticipated, and which may be the result of improper and unauthorized negligent action of another player." Again this Court, speaking in Lora v. Maule Industries, Inc., Fla.App. 3, 1970, 235 So.2d 743, and in reversing a defendant's summary judgment, followed plaintiff's argument "that there was no evidence presented to show that he appreciated the nature, character and extent of the danger involved ..." It is consequently the law that "actual knowledge is essential to a voluntary assumption of risk of a peril." Dana v. Bursey, Fla.App. 2, 1964, 169 So.2d 845, 846. See, also, the current opinion of the Supreme Court of Florida in Cleveland, as Administratrix v. City of Miami, filed May 26, 1972, 263 So.2d 573, 575-577, where, re-instating a jury verdict and consequent judgment for a lady whose husband had been killed by police fire in the City of Miami (the deceased and plaintiff having occupied a third floor balcony to observe some 30 or 40 officers in an area filled with milling people hurling rocks and bottles, the deceased on the balcony being struck by one of the bullets from "between 75 and 100 rounds of ammunition" which the police fired in the direction of the apartment complex upon hearing "what sounded like several gunshots" coming "from the direction of the apartment complex"), the Court flatly held that there was "no error in the trial court's decision not to send the question of assumption of the *423 risk to the jury"  and quoted approvingly from a note to the Florida Standard Jury Instruction 3.8 on "Assumption of Risk", that a charge on it should "be given only in those cases where the jury may find that claimant `more or less deliberately' and willingly exposed himself to the specific risk which resulted in his injury and damage."[5]

Plaintiffs' Motion for Directed Verdict Proper Against Defendant Larry Daughtry

This conclusion inescapably follows from the evidence as we understand it, and have tried to fairly portray it above. It is axiomatic that "the legal sufficiency of the evidence is a matter of law for the Court to determine; ..." Kenny v. Langston et al., 133 Fla. 6, 182 So. 430, 432, 1938; and it therefore follows, as the night the day, that "It has been held in Florida that where there is evidence to support an issue, it should be submitted to the jury; but otherwise not." Saucer v. City of West Palm Beach, 155 Fla. 659, 21 So.2d 452, 454, 1945; emphasis that of the Court. Placed in a plaintiff's perspective, "Where the evidence fully makes out the plaintiff's case, and there is no evidence to contradict or rebut it, a directed verdict for the plaintiff is proper", Garris v. Robeison, Fla.App. 2, 1962, 146 So.2d 388, 389, 391; approving the lower court's striking of a defendant's plea of contributory negligence; saying that "the ultimate effect of the court's action was to eliminate an affirmative defense upon which there was no material issue of fact." Richardson v. Sams, Fla.App. 1, 1964, 166 So.2d 468, 472, also was called upon to decide that "an issue on which there is no or insufficient competent, substantial evidence adduced at the trial should not be submitted to the jury for determination."

The Father's Directed Verdict was Proper
Here plaintiffs, if they would succeed against the elder Daughtry, must almost do the opposite of "visiting the iniquity of the fathers upon the children unto the third and fourth generation", Numbers, 14:18; for "the courts have held the owner of a firearm liable for injury only if there was negligence in the entrustment of the firearm. See Seabrook v. Taylor above, [Fla.App. 1967, 199 So.2d 315]; cf. Sixty-Six, Inc. v. Finley, Fla.App. 1969, 224 So.2d 381." Brien v. 18925 Collins Ave. Corp., Fla.App. 3, 1970, 233 So.2d 847, 849.
Such negligence on the part of the defendant Frank Logan Daughtry is wanting here.

Conclusion
Thus it is that we affirm the judgment entered upon Frank Logan Daughtry's directed verdict below. However, for the reasons assigned, we respectfully send this case back to the trial court with directions to set aside the verdict and judgment in favor of the defendant Larry Daughtry; grant plaintiffs' motion for a directed verdict as to him; and hold a new trial of just the issue of those damages for which he is liable to the plaintiffs.
Affirmed in part and reversed in part.
CARROLL, Judge (concurring in part and dissenting in part).
I concur in the affirmance of the judgment entered in favor of the defendant Frank Daughtry upon granting his motion for a directed verdict, but I respectfully dissent from the majority's reversal of the judgment entered in favor of the minor defendant Larry Daughtry which was based on a jury verdict.
NOTES
[1] Implicit in the foregoing is the pertinent trial scenario protecting the record. The judge charged the jury on the twin defenses of contributory negligence (203) and assumption of risk (204); this, over the explicit objections of plaintiffs (202). Assignments of error 5, 6, 9, 10, and 12 preserve the points before us. Plaintiffs had already moved for a directed verdict on the liability issue (188); the trial court's denial of the motion being the subject of assignments of error 5, 6, 8, 9, and 10. Page 188 of the record contains the court's granting of defendant Frank Logan Daughtry's motion for a directed verdict. This ruling is challenged by assignment of error 7.
[2] The record (129) shows that these questions were asked of Acosta and these answers given:

"Q. He (Daughtry) never gave you any reason in what he did before this accident for you to think that he was careless around guns, did he?
"A. No.
"Q. Certainly not. Otherwise you would not be in the same room with him with a gun, would you?
"A. No."
This was developed on the cross-examination of the plaintiff.
[3] Yet what might he not have done? "... if you find from the evidence that the defendant, by looking and exercising the vigilance which it was his duty to the plaintiff to exercise, would have discovered the plaintiff's peril and that thereafter the defendant failed to properly look where his gun was pointing and failed to exercise or make use of his ability to avoid shooting the plaintiff and negligently and carelessly discharged his gun and thereby injured the plaintiff, then you should find for the plaintiff." Skinner v. Ochiltree, 148 Fla. 705, 5 So.2d 605, 608, 1942; part of a jury instruction which the Supreme Court held should have been given.

The above enunciation alone would, under the peculiar evidence in the case at bar, seem to foreclose any affirmance of the judgment in favor of the defendant Larry Daughtry  but rather to indicate the propriety of the affirmative charge against him which the instant plaintiffs had requested.
[4] Acosta swore positively that he did so inform Daughtry who, on that score, simply said, "He might have. I don't remember."
[5] Again, and at an uncommendable risk of repetition ad nauseum, not by the wildest stretch of the imagination could it be asserted that Angel Acosta "deliberately and willingly (recall footnote 2, supra) exposed himself to the specific risk" of knowing (Dana, supra) that a skilled pistolier, and his friend, would point this gun at him; much less would pull its trigger after doing so!